THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEANETTE DANIELS, Defendant-Appellant.

First District (6th Division)   No. 1—06—3514

Opinion filed May 15, 2009.

Patricia Unsinn and Aliza R. Kaliski, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Annette Collins and Abigail Siedlecki, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOSEPH GORDON delivered the opinion of the court:

## I. NATURE OF THE CASE

The following are undisputed facts. On February 28, 2004, the 29-year-old victim, Alonzo Jones, was present in defendant's apartment at 7425 South Parnell, when he was accused by codefendant Laquita Calhoun of molesting her child. As a result of this accusation, the victim was attacked, beaten and sodomized by codefendants Terrence Jones, Katherine Calhoun, and Laquita Calhoun, in the presence of Derrick Fleming, Lakesha Collins and defendant. The victim was then dragged outside and placed in the trunk of Derrick Fleming's car. His body was later found in an alley near 5630 South Michigan Avenue.

On March 3, 2004, without the benefit of an attorney and after being advised of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628 (1966), defendant confessed to her participation in the crime and gave a videotaped statement to police. Soon thereafter, together with five codefendants,[1] defendant was indicted on 16 charges, including: (1) five counts of first degree murder (720 ILCS 5/9—1(a)(1) through (a)(3) (West 2002)); (2) four counts of aggravated kidnaping (720 ILCS 5/10—2(a)(3) (West 2002)); (3) two counts of kidnaping (720 ILCS 5/10—1(a)(1), (a)(2) (West 2002)); (4) and five charges of aggravated battery (720 ILCS 5/12—4(a), (b)(8) (West 2002)).

Following a bench trial in the circuit court of Cook County defendant, Jeanette Daniels[2], was found guilty of aggravated kidnaping and sentenced to 14 years' imprisonment. On appeal, defendant contends the trial court erred in denying her motion to suppress her videotaped confession. She also contends that the trial court erred in barring the trial testimony of defense expert Dr. Bruce Frumkin, regarding the tests he administered to her to assess her "interrogatory suggestibility." For the reasons that follow, we reverse.

---

[1]Codefendants Lakesha Collins, Terrence Jones, Katherine Calhoun, Laquita Calhoun, and Navon Foster were all charged with first degree murder, aggravated kidnaping, kidnaping and aggravated battery. Terrence Jones and Laquita Calhoun were also charged with aggravated criminal sexual assault. Laquita Calhoun and Navon Foster were also charged with possession of a stolen motor vehicle and burglary. Codefendant Laquita Calhoun was tried simultaneously with defendant, but in a jury, rather than bench, trial. Prior to defendant's trial in this case, codefendants Lakesha Collins and Katherine Calhoun had each pleaded guilty to murder in exchange for a 20-year sentence. Both of these codefendants testified at defendant's trial on behalf of the State.

[2]We note that the correct spelling of Jeanette's last name is Daniel. However, as the indictment and all of the court documents below, spell her last name as "Daniels," for the sake of consistency, we use "Daniels" as well.

## II. BACKGROUND

### 1. Pretrial Proceedings

Although the issues in this case involve defendant's ability to comprehend *Miranda* warnings and the impact of her "suggestibility" in rendering her videotaped confession, we begin our factual presentation with defendant's initial fitness hearing.

### A. Fitness Hearing

On April 13, 2005, a fitness hearing was held to determine whether defendant was fit to stand trial. At that hearing the parties offered the testimony of two court-appointed witnesses, Dr. Sharon L. Coleman and Dr. Roni Seltzberg. Dr. Seltzberg, a board-certified staff psychiatrist for the Cook County circuit court, was qualified as an expert in forensic psychiatry and testified that on November 3, 2004, pursuant to a court order, she evaluated defendant to determine whether defendant was fit to stand trial. Dr. Seltzberg testified that based on her interview with defendant, as well as several documents[3] that she reviewed prior to speaking with defendant, it was her opinion to a reasonable degree of medical and psychiatric certainty that defendant was unfit to stand trial because she did not understand the roles of court personnel, the court proceedings or the possible outcomes of her case, and because she had limited cognitive functioning, suffering from what Dr. Seltzberg identified as "mild retardation or borderline intellectual functioning." Dr. Seltzberg, however, did not rule out the possibility of defendant's progressing to "fitness" with sufficient training.

Dr. Seltzberg specifically explained that it was apparent from her conversation with defendant that defendant did not understand basic concepts and terminology relevant to courtroom proceedings. Specifically, defendant did not understand the difference between a bench and a jury trial, or the roles of different courtroom personnel including the judge and the State's Attorney. In addition, Dr. Seltzberg was concerned with defendant's continued assertion that she understood the relevant terminology, although it was apparent that she did not have a proper understanding. Dr. Seltzberg also testified that when

---

[3]Some of the documents that Dr. Seltzberg reviewed prior to meeting defendant included: (1) a hospitalization case report form the Chicago police department dated February 29, 2004; (2) a supplementary report regarding an anonymous tip to the Chicago police department regarding the attack on Alonzo Jones; (3) defendant's criminal history report reflecting no prior arrests; and (4) a report of the proceedings from the May 2004 grand jury indictments in the cause at bar.

she attempted to teach defendant some of the relevant courtroom terminology, defendant was unable to retain the information.

According to Dr. Seltzberg, defendant also exhibited symptoms of depression, which could itself add to defendant's inability to retain information, to concentrate during trial, follow the proceedings, and cooperate with her counsel to her benefit.

On cross-examination, Dr. Seltzberg acknowledged that after her interview with defendant she had occasion to view defendant's videotaped confession, but she asserted that this videotape did not change her expert opinion regarding defendant's fitness to stand trial.

The parties next stipulated with regard to the expert testimony of clinical psychologist Dr. Sharon L. Coleman. The parties stipulated that if called to testify, Dr. Coleman would state that pursuant to a court order she evaluated defendant to determine if defendant was fit to stand trial and that in her opinion defendant was currently unfit because of cognitive limitations which seriously compromised her understanding of courtroom procedures, the roles of key courtroom personnel, and the overall workings of the legal system. According to Dr. Coleman, defendant was not capable of effectively considering possible defense strategies or collaborating with her attorney. Dr. Coleman would concur with Dr. Seltzberg that defendant also exhibited symptoms of depression, which could add to defendant's inability to understand the relevant courtroom procedures, or actively participate in the proceedings against her. Dr. Coleman would further testify that defendant can be restored to fitness within one year.

Based on the aforementioned testimony, the circuit court found defendant unfit to stand trial and remanded her to Alton Mental Health Center for appropriate treatment.

## B. Restoration Hearing

On December 12, 2005, the court held a restoration hearing.[4] At that hearing the State first called Dr. David Montani, an expert in psychiatry, who testified that as part of his work at Alton Mental Health Center, he treated defendant at that center between May 12, 2005, and October 17, 2005.

Dr. Montani testified that he initially diagnosed defendant with schizo-affective disorder of the depressed type. He explained that patients with this disorder exhibit full-blown depressive episodes, in

---

[4]That hearing was held as a result of a letter written to the court by Claudia Kachigian, the medical director of Alton Mental Health Center, as required by sections 104—18(a)(2) and 104—20 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—18(a)(2), 104—20 (West 2002)), which advised the circuit court that defendant was fit to stand trial.

addition to symptoms of psychosis, such as, in defendant's case, hearing voices. To treat defendant, Dr. Montani prescribed her an antipsychotic medication, Risperdal.

Dr. Montani further testified that in his opinion defendant was mildly mentally retarded. He explained that the diagnosis requires three components: (1) a low IQ (less than 70); (2) onset of the low IQ prior to age 18; and (3) impaired social functioning. He stated that the tests he performed on defendant revealed that defendant had an IQ of 64, with an onset prior to age 18, and that the results of the test he administered to defendant to evaluate her basic skills indicated that she was the functional equivalent of an eight-year-old child. Specifically, according to Dr. Montani defendant was unable to write her address or recall her social security number even though her disability income was based on knowing this number. Based on the foregoing, Dr. Montani concluded that defendant was incapable of understanding basic terminology relevant to criminal court proceedings.

Dr. Montani testified that beginning in May 2005, as part of his treatment plan for defendant, he met with defendant at least once a week, both to provide therapy and to teach her the basic concepts necessary for her to become fit to stand trial. Dr. Montani testified that twice a week defendant also attended formal classes teaching general information about the criminal court system, including roles of court personnel, the stages of a criminal proceeding, and proper courtroom behavior. Dr. Montani finally averred that after his last meeting with defendant on September 23, 2005, he came to the conclusion to a reasonable degree of medical certainty that defendant was fit to stand trial while on medication (Risperdal).

Dr. Roni Seltzberg, an expert in forensic psychiatry, next testified on behalf of defendant. She averred that pursuant to a court order she evaluated defendant in October 27, 2005, to determine whether defendant's mental state had improved so as to make her fit to stand trial. Dr. Seltzberg stated that it was her opinion within a reasonable degree of medical and psychiatric certainty that defendant was not yet fit to stand trial because she continued to reveal confusion regarding roles of courtroom personnel and court proceedings.

Specifically, Dr. Seltzberg averred that defendant still had a poor grasp of the roles of different courtroom personnel. She explained that even though defendant could initially give a three-word memorized answer as to the roles of the judge, public defender, State's Attorney and witnesses, when she was asked to explain in her own words the role of these individuals, she became confused. For example, Dr. Seltzberg testified that when she asked defendant what a bench trial is, defendant responded that "it was 12 people and your P[ublic]

D[efender] see if you were guilty or not." When Dr. Seltzberg probed defendant to explain what the public defender's job was, defendant gave the memorized answer "to help me." However, when Dr. Seltzberg asked her "so then your P[ublic] D[efender]'s job is to also see if you are guilty or not," defendant responded with "yes." When Dr. Seltzberg gave her a disapproving look, and asked if she was sure, defendant changed her mind and stated, "no, I mean the State's Attorney is trying to find you guilty."

Dr. Seltzberg further averred that defendant had a poor grasp of her rights. For example, when Dr. Seltzberg asked defendant if she had to testify at trial, defendant indicated that she did not. However, when Dr. Seltzberg asked her if she had to testify at a bench trial or before a jury, defendant stated that she did. Dr. Seltzberg also explained that defendant appears not to understand the concept of a plea bargain and that she thinks that taking a plea means pleading "not guilty."

Dr. Seltzberg acknowledged that approximately 10 days prior to her evaluation of defendant, defendant had been removed from Alton Mental Health Center and placed in jail. Dr. Seltzberg opined that because defendant had not been receiving any treatment or training during this short period of time in jail, it was likely that because of her cognitive impairments she had forgotten whatever information she had learned and retained while at Alton.

Based on the foregoing testimony, the circuit court found defendant fit to stand trial.

## C. Hearing on Defendant's Motion to Suppress Statements

On January 13, 2006, defendant filed a motion to suppress statements she had made to police at the time of her arrest, alleging that she had not understood the *Miranda* warnings given to her by police because of her low cognitive abilities, including an IQ of 55 and a second-grade reading level. The hearing on the motion to suppress was held in May 2006.[5]

The State first called Detective William Brogan, who testified that he has been a detective with the Chicago police department for over five years. Detective Brogan averred that at about 10 p.m., on March 1, 2004, together with his partner Detective John Murray, he met defendant and her three children at the front desk of Area 4 police station. According to Detective Brogan, defendant had come to the

---

[5]The witnesses were presented out of order so as to facilitate the viewing of defendant's videotaped confession. For purposes of clarity, we have presented the testimony of the witnesses as they would have appeared in a regular hearing on a motion to suppress.

police station of her own free will. While standing at the front desk, defendant told the detectives that "something bad" had happened at her house, that she had been "involved," and that she knew what happened to the victim, Alonzo Jones. Detective Brogan testified that at this point he stopped defendant and told her that based on what she was telling him, he could charge her with a crime. Detective Brogan proceeded to read defendant her *Miranda* rights from a preprinted Fraternal Order of Police (F.O.P.) card, which he carries in his wallet.

Detective Brogan next took defendant into an interview room. Without discussing the details of his conversation with defendant, Detective Brogan simply testified that he spoke to defendant for about 15 to 20 minutes and that during that time there was nothing in defendant's demeanor that would lead him to believe that defendant had trouble understanding the conversation. In fact, Detective Brogan averred that defendant "appeared to follow him," and that "he did not have to stop to explain anything to her."

According to Detective Brogan, after the interview, defendant and her three children were taken to a hotel because defendant had told police that she was being threatened by some of the individuals she had implicated in the crime. Detective Brogan explained that at this point, defendant was not in police custody and that she was free to leave the hotel at any point that night.

Detective Brogan further averred that after leaving defendant at the hotel, he proceeded to locate and interview the individuals that defendant had implicated in the crime, specifically Derrick Fleming, Terrence Jones and Lakesha Collins. As a result of these interviews, on the following morning, March 2, 2004, at about 9 a.m., Detective Brogan returned to the hotel and arrested defendant in connection with the murder of Alonzo Jones. Once again at the police station, defendant gave a statement to police in the presence of Detective Brogan and Assistant State's Attorney (ASA) Jeff Levine. According to Detective Brogan, prior to this interview, ASA Levine advised defendant of her *Miranda* rights. Again without providing any details of that colloquy, Detective Brogan averred that defendant "appeared to understand her rights, and [that] she agreed to speak with them."

According to Detective Brogan, defendant consented to having her statement videotaped and signed a consent form. Detective Brogan averred that the consent form was explained to defendant and that she "appeared to understand what it entailed." Accordingly, at about 2:54 a.m. on March 3, 2004, a videotaped statement was made, again in the presence of Detective Brogan and ASA Levine.

On cross-examination, Detective Brogan conceded that he has no specialized training with respect to intelligence, or psychology, and

that prior to speaking with defendant he did not question defendant about her educational background and, therefore, had no knowledge about her particular abilities.

Jeff Levine, former assistant State's Attorney, next testified that he took defendant's videotaped statement at approximately 3 a.m., on March 3, 2004. He stated that prior to taking defendant's statement, he informed defendant that he was an attorney, but not her attorney. Levine then recited defendant's *Miranda* rights to her from memory. When he asked defendant whether she understood those rights and whether she wanted to speak with him, defendant responded "yes." Without providing any details of their conversation, Levine character- ized defendant as cooperative and her responses as "appearing to make sense."

On cross-examination, Levine acknowledged that defendant was "not the brightest person he ever spoke to." Levine also admitted that prior to having defendant sign a consent form agreeing to videotape her confession, he never ascertained whether she could read or write.

The State next introduced defendant's videotaped confession as proof that at the time of her statement defendant was capable of understanding her *Miranda* rights. That videotaped statement revealed that defendant was first asked if ASA Jeff Levine and Detec- tive Brogan had both previously advised her of her constitutional rights, and she responded with "yes." Defendant was also asked if ASA Levine had explained to her that he was a State's Attorney and that he was not there to represent her rights, and she again replied with "yes." The videotaped statement next reveals that ASA Levine recited the *Miranda* warnings to defendant, asking her if she understood each right, and defendant simply responded with "yes" to each question. Defendant was next asked if she had gone through these rights with ASA Levine "several times" and had agreed to speak with police, and she again responded in the affirmative.

Defendant then spelled her name and gave her address as 7425 S. Parnell Street. She indicated that she is 29 years old and that she graduated from Lucy Flowers High School. Defendant stated that she has five children and that she lived with them and the victim, Alonzo Jones. Defendant stated that she pays the bills for the apartment herself.

Defendant was next questioned about the events which occurred on February 28, 2004, and related her involvement in the crime.[6]

---

[6]We note that for purposes of brevity, the details of defendant's videotaped confession relating to the events of February 28, 2004, are detailed below in the context of the evidence presented at defendant's trial.

Defendant next stated that she was treated well by the police, that she was given food and water and that the police permitted her to stay in a hotel with her children. She averred that no one had threatened her or promised her anything in return for the statement. Defendant was next asked whether her statement was voluntary and the following colloquy occurred:

"ASA Levine: Are you giving this statement freely and voluntarily?

Defendant: What's that mean?

ASA Levine: Why are you giving this statement?

Defendant: Ummmm.

ASA Levine: You want to cooperate?

Defendant: Yes.

ASA Levine: You told me before that you are giving this statement because you want to cooperate? You want to get this off your chest?

Defendant: Yes."

The State next called Dr. Nishad Nadkarni, a staff forensic psychiatrist at the Forensic Clinical Services Department of the circuit court of Cook County, who was qualified as an expert to render an opinion as to defendant's ability to understand the *Miranda* warnings.[7] Dr. Nadkarni testified that on March 9, 2006, he evaluated defendant pursuant to a court order to determine whether she had the capacity to understand her *Miranda* rights, and he determined to a reasonable degree of scientific certainty that at the time of her arrest on March 3, 2004, defendant would have been capable of understanding *Miranda* warnings.

Dr. Nadkarni testified that in arriving at his conclusion, he reviewed a number of pertinent documents,[8] as well as interviewed defendant. Dr. Nadkarni averred that at the beginning of his interview,

---

[7] We note that during *voir dire*, Dr. Nadkarni admitted that he is not a board-certified forensic psychiatrist. Consequently, the State did not offer Dr. Nadkarni as an expert in forensic psychiatry but, rather, only as an expert capable of rendering an opinion as to defendant's ability to understand the *Miranda* warnings.

[8] These documents include: (1) defendant's psycho-social history prepared by social worker Yvonne Edwards, (2) the psychiatric summaries prepared by Dr. Roni Seltzberg; (3) the psychological summary prepared by Dr. Sharon L. Coleman; (4) the police report and documents pertaining to defendant's arrest; (5) defendant's medication chart; (6) reports from Alton Mental Health Center, which revealed that defendant had been remanded to the center in 2005 as unfit to stand trial, and that she was diagnosed, *inter alia*, with schizo-affective disorder (depressed type), depression, and mild mental retarda-

he asked defendant to provide her own account of the arrest. Defendant told Dr. Nadkarni that she did not ask for an attorney at the time of her arrest because she believed she did not need one since she "just came to tell them what happened." Defendant also told Dr. Nadkarni that she recalled being read her *Miranda* rights. When asked what the *Miranda* rights were, however, defendant replied, "You got to tell us what happened. Do you need a lawyer?"

Dr. Nadkarni then proceeded to read the *Miranda* rights from an F.O.P. handbook to defendant, asking her to explain each right as he went along. With respect to the right to remain silent, defendant responded "you could be quiet or you could talk." When questioned about the meaning of the word "right," defendant again responded "You could talk." With respect to the warning that anything she says could be used against her in court, defendant stated "That mean I can talk. If I did talk, they could show it to the judge what I'm saying, read the paper, see if I'm right or wrong, lock me up, sends [*sic*] me to jail." With respect to the right to have a lawyer present, defendant responded "To help me to lead my case, to listen to your case, to see your rights about what I'm saying." With respect to the right to an appointed attorney if she could not afford one, defendant responded "They gave me a lawyer because I told them I couldn't get no lawyer because I had not [*sic*] money." Dr. Nadkarni admitted, however, that he did not ask defendant when she was provided with an attorney.

Dr. Nadkarni further testified that during the interview, defendant was cooperative, polite and pleasant, did not demonstrate any abnormalities in movement, such as hyperactivity, and was capable of answering questions in a linear fashion.

Dr. Nadkarni noted, however, that defendant exhibited problems with cognition, so he asked her a series of very simple screening questions to determine her cognitive abilities. According to Dr. Nadkarni, defendant was able to identify the date within two days. When asked to memorize and repeat three items, defendant was able to repeat the three items after a first recital, but was only able to recall one out of those three items after a brief delay. Defendant was able to spell the word "world" backwards and forward. She required some prompting as far as identifying the current president of the United States. She was able to correctly identify the number of months in a year as well as to name five cities upon request. According to Dr. Nadkarni, defendant gave "an adequate response" when prompted to identify similarities and differences between an apple and a banana, by saying "You eat them," and then "They are fruit."

---

tion with an IQ of 64; and (7) the transcript of defendant's videotaped statement.

Dr. Nadkarni also tested defendant's ability for abstract thought and concluded that although defendant exhibited more concrete rather than abstract thinking, she appeared to be capable of exercising adequate judgment. To test defendant's ability for abstract thought, Dr. Nadkarni asked defendant to explain the meaning of two proverbs: (1) "You put me between a rock and a hard place," and (2) "Don't cry over spilled milk." Although defendant was unable to explain the meaning of "You put me between a rock and a hard place," she explained that "Don't cry over spilled milk," means "Don't cry over something you don't have." Moreover, according to Dr. Nadkarni defendant exhibited "adequate judgment" when asked about what to do if there was a fire in a movie theater, by responding, "Lay on the floor, go out the window."

Dr. Nadkarni next opined that even though defendant exhibited some signs of cognitive impairment, she had been improperly diagnosed with mild mental retardation at Alton Mental Health Center. Dr. Nadkarni explained that the definition of mild mental retardation according to the fourth edition of the Diagnostic and Statistical Manual for Mental Disorders (DSMV-IV) requires three components: (1) IQ less than 70; (2) poor adaptive functioning, and (3) onset before 18. According to Dr. Nadkarni although defendant fulfills two of the three criteria (low IQ and onset before 18), she does not exhibit poor adaptive functioning. Dr. Nadkarni testified that he based this opinion on the fact that during the interview, defendant appeared to be linear, logical, and goal directed.

On cross-examination, Dr. Nadkarni conceded that he interviewed defendant two years after her arrest. He also acknowledged that during his evaluation of defendant, he never reviewed Dr. Frumkin's report and never asked defendant whether she had learned about *Miranda* rights while in custody. Dr. Nadkarni also admitted that in determining whether defendant had the capacity to understand her *Miranda* rights, he did not administer the standardized Function of Rights in Interrogation test (FRI test)[9] administered by Dr. Frumkin. Dr. Nadkarni also conceded that the reports of Alton Medical Health Center where defendant was admitted in 2005 as unfit to stand trial revealed that defendant was more disoriented than she appeared during her interview with Dr. Nadkarni, specifically that defendant did not know where she was or what date it was.

---

[9]As shall be discussed in more detail below with respect to Dr. Frumkin's testimony, this is a test utilized to evaluate a person's ability to comprehend and intelligently use *Miranda* rights, by reading a series of short stories to defendant about a person being interrogated by police and then questioning defendant about that person's rights in the context of the stories.

On cross-examination, Dr. Nadkarni also admitted that in order to determine defendant's cognitive abilities, he never administered any standardized tests, nor used any psychological testing, such as the Wechsler Adult Intelligence scale. Rather, he explained that the questions he posed to defendant in testing her cognitive traits are generally deployed in screening for gross organic impairment.

After the State presented its case, defendant first called Yvonne Edwards, a licensed clinical social worker for the Cook County circuit court Forensic Clinical Services. Edwards averred that her job is to compile a socio-psychological history of defendants and provide it to the psychologists and psychiatrists employed by the circuit court.

Edwards testified that she became involved with defendant's case on October 18, 2004. On that date, Edwards spoke with defendant's mother and defendant's sister, Kisha Daniel. Edwards testified that she learned from defendant's family that defendant lived in federally subsidized housing with her three young children, and that her only income was from social security checks, which she received based on her learning disability. Except for a short two-month period during high school, defendant has never been gainfully employed.

Defendant's mother and sister told Edwards that every time they visited defendant, defendant's apartment was filled with people from the neighborhood, eating defendants' food and stealing from her. Her family reported that defendant did not necessarily want these people in her apartment, but that she did not know how to throw them out. According to defendant's family there was a problem with the front door lock and anyone could come into defendant's apartment whenever they wanted. Defendant's sister also told Edwards that during these visits, she often observed defendant sitting on the floor in the corner of the room sucking her thumb. She also stated that defendant had recently been losing weight, that her housekeeping had declined and that her children were not being cared for as well as they had previously been.

According to Edwards, defendant was in special education classes throughout her schooling and graduated from high school at age 19. Defendant's family told Edwards that defendant's reading skills were limited to two- and three-letter words. Defendant had poor comprehension skills and she could understand instructions only if they were given slowly and in simple terms. Defendant's family also told Edwards that defendant would not make it known when she did not understand something.

Although defendant lived alone, defendant's family often brought defendant food, took her grocery shopping and helped her with everyday errands. Defendant's family also reported that defendant

needed assistance in traveling outside of her familiar surroundings. Although defendant did not know how to drive, earlier that year, a male friend had persuaded defendant to purchase a vehicle and that after she did, the man took the vehicle and disappeared.

Edwards also testified that as part of her routine psychological history she conducted a criminal background check on defendant and determined that defendant had no prior convictions or arrests and therefore no prior contact with the criminal justice system.

Defense counsel next called Dr. Roni Seltzberg, an expert in the field of forensic psychiatry. Dr. Seltzberg testified that she last spoke to defendant on February 14, 2006, pursuant to a court order requiring an evaluation to determine whether defendant was fit to stand trial and whether she was capable of understanding her *Miranda* rights. Dr. Seltzberg explained that prior to that she evaluated defendant twice pursuant to court orders: (1) in November 2004 for an opinion regarding defendant's fitness for trial, and (2) on October 27, 2005, regarding defendant's fitness and her ability to understand *Miranda* rights. Dr. Seltzberg stated that based on these three evaluations, and a number of records,[10] which she reviewed, it was her opinion to a reasonable degree of medical and psychiatric certainty that defendant did not have the ability to understand *Miranda* at the time of her arrest and videotaped statement in March 2004.

---

[10]Dr. Seltzberg stated that she relied, *inter alia*, on the following records: (1) the consolidated referral order dated October 11, 2005; (2) defendant's arrest report dated March 3, 2004; (3) a case report describing the events that took place on February 29, 2004, resulting in the death of the victim Alonzo Jones; (4) a supplementary report referencing an anonymous 911 telephone call regarding the incident; (5) defendant's criminal history report, reflecting no prior arrests or convictions and therefore no familiarity with custodial interrogations; (6) the May 2004 grand jury indictments; (7) her own previous psychiatric summaries evaluating defendant, dated November 3, 2004, and October 27, 2005; (8) a psychological summary prepared by Dr. Coleman of Forensic Clinical Services on February 24, 2005; (9) a psychological history of defendant prepared by social worker Yvonne Edwards and based in part upon information provided to her by defendant's mother and sister in October 2004; (10) reports from the Alton Mental Health Center, where defendant had been admitted as unfit to stand trial on May 12, 2005, which revealed that defendant was diagnosed with schizo-affective disorder, as well as mild mental retardation, because she had a full scale IQ of 64 (with verbal IQ about 60 and performance IQ about 70), a history of special education, and poor social functioning, with an onset prior to the age of 18; (11) a medication profile from Cermak Health Services, reflecting that defendant was being treated with two antidepressants and an antipsychotic medication.

Dr. Seltzberg first averred that her conclusion was based in part upon her review of the records prepared by various doctors at Alton Mental Health Center, and the socio-psychological history prepared by social worker Yvonne Edwards which, according to Dr. Seltzberg, established that defendant was mildly mentally retarded based on her low IQ and poor adaptive functioning. With respect to defendant's low IQ, Dr. Seltzberg testified that she was aware that defendant had been administered the Wechsler Adult Intelligence Scale test on two occasions, once in 2004 by Dr. Bruce Frumkin, and the second time in 2005 by Dr. Sellers from Alton Mental Health Center, and that defendant's IQ score improved from 55 in 2004 to 64 in 2005. Dr. Seltzberg averred, however, that this difference could be explained by what is referred to as "practice effect," or slight or somewhat improvement upon a second administration of the IQ test simply because of familiarity with the test.

Dr. Seltzberg next testified regarding her first, October 2005, evaluation of defendant with respect to defendant's ability to comprehend *Miranda* rights. According to Dr. Seltzberg, during that interview, when she asked defendant what *Miranda* rights meant, defendant responded, "They say put your hands behind your back and if you get the P[ublic] D[efender], they got [*sic*] one for you." Dr. Seltzberg averred that based on this response she believed defendant was using terminology that she had heard before, but which she did not comprehend. She therefore attempted to break down the terminology by asking defendant, "What is a right?" to which defendant responded "I can get another lawyer if I think that lawyer can't help me." According to Dr. Seltzberg, defendant's response indicated confusion in an attempt to give an answer, rather than an understanding of *Miranda*. She therefore attempted to break down the terminology even further by asking defendant, "if you have a right to vote" then "what is a right?" Defendant responded that she did not know because "they didn't tell me."

Dr. Seltzberg testified that she also questioned defendant regarding her understanding of the right to remain silent. When asked what a right to remain silent means, defendant responded "Go to jail." When asked "why it means to go to jail," defendant responded, "Because of the statement I said." After Dr. Seltzberg continued to question defendant about the right to remain silent, attempting to break the question down to simpler terminology, defendant at one point stated, "I could talk or I don't have to talk." When Dr. Seltzberg asked her how she knew this, defendant responded "I was just guessing, is that right?" Dr. Seltzberg inquired why defendant had been guessing, but defendant just laughed. Dr. Seltzberg continued

questioning defendant by asking her "what does the word remain mean," and defendant responded "just be quiet," and "you don't say nothing." When Dr. Seltzberg asked defendant what "silent" means, defendant answered "you don't say nothing." Dr. Seltzberg then asked defendant whether "remain" means the same as "silent," and defendant responded, "No. Remain is you got to [*sic*] talk"

Dr. Seltzberg next averred that during her evaluation of defendant in October 2005, she also conducted a mental status exam to evaluate defendant's ability to recall and retain information, as well as process abstract thoughts. According to Dr. Seltzberg this test involves asking defendant a series of questions relating to things such as current time, locations of places, names of cities, examples of proverbs, etc.

Specifically, as part of this evaluation, Dr. Seltzberg first asked defendant to remember three things, "Address 63 Broadway, watch and shoe," and to be able to repeat them. Defendant could immediately repeat all three things. Dr. Seltzberg then told defendant that she would ask her some other questions but that she wanted defendant to remember the three things and be able to repeat them when prompted. Defendant indicated that she understood. Dr. Seltzberg then proceeded to ask defendant other random questions. When at some point, she went back and asked defendant to recall the three items, defendant remembered ''36 Broadway'' (interposing the original address number—63), but could not remember watch and shoe, and instead offered "star and short drive."

Dr. Seltzberg next asked defendant to name the president of the United States, or any baseball team, but defendant could not. When asked where the sun rises, defendant responded, "right as opposed to left."

When asked if she could read, defendant first indicated that she did not know how to read, except for "little" words, but then offered to show Dr. Seltzberg that she could spell by attempting to spell the word "tomorrow." However, defendant then misspelled the word. Defendant could spell her last name both forward and backwards.

With respect to counting, Dr. Seltzberg testified that defendant could calculate change by counting in fives using her fingers, and she was able to tell how many nickels are in a dollar. However, she could not perform more complex calculations, such as determining how many nickels were in 35 cents, or in 1 dollar and 35 cents.

Dr. Seltzberg testified that based on the aforementioned evaluation, in her opinion in October 2005, defendant was making associations from materials and terminology she had learned having gone through several different evaluations, as well as the restoration treatment at Alton Mental Health Center, to the questions that were specifi-

cally being asked her about *Miranda* rights, but she did not have a full understanding of those rights.

Dr. Seltzberg next testified that in February 2006, nearly two years after defendant's videotaped confession, she performed a second evaluation of defendant specifically focused on defendant's ability to understand *Miranda* rights at the time of her arrest in March 2004. Before this evaluation, defendant had received repeated and thorough instruction on *Miranda* warnings both in jail, and at Alton Mental Health Center, as well as during previous psychiatric evaluations by both Dr. Seltzberg and Dr. Frumkin. Dr. Seltzberg averred that during this interview with defendant she had with her a copy of the transcript of defendant's videotaped confession. Dr. Seltzberg first asked defendant to provide her with her own account of how she came to the police station. Defendant told Dr. Seltzberg that she had spoken to a girlfriend and told her that she was scared because of what had happened at her house. The friend suggested that defendant call the police and then used her cell phone to call the police on defendant's behalf. The police told defendant's friend that defendant would have to come to the police station, so the friend drove defendant there.

Dr. Seltzberg averred that she next questioned defendant about her conversation with the interviewing detective and ASA Levine. Dr. Seltzberg asked defendant exactly what she understood her rights to be after ASA Levine explained these rights to her, and defendant responded, "If I got no judge, pointed to me, if I ain't got no judge [*sic*]. They'll appoint a lawyer. If I don't have a lawyer, they have one for me."

Dr. Seltzberg next averred that she asked defendant to explain the role of an attorney, and defendant responded, "to help me with my case." Dr. Seltzberg asked defendant to explain what she understood when ASA Levine told her that as an assistant State's Attorney, he was a prosecutor and not her lawyer, and defendant responded, "just a person talking to me but he is not no lawyer." Defendant then indicated that she first learned the term "Assistant State's Attorney" at Alton Mental Health Center.

Dr. Seltzberg also evaluated defendant's capacity to understand that she had a right to an attorney present during questioning, and that if she could not pay for one herself, one would be provided to her by the court. Referring to the transcript of the videotaped confession, Dr. Seltzberg first asked defendant to explain what the detective meant when he told her that she had a right to counsel present. Defendant responded that "he said I could talk or talk later from them to get a lawyer for me. I don't know how to say it the way they said." Dr. Seltzberg asked defendant why she thought the detective advised her

of her right to have counsel present, and defendant responded, "See if I want to talk. And told them what happened. I told them I got no lawyer. Maybe they'd get one for me. Maybe I could talk. See do I have a lawyer." Dr. Seltzberg then asked defendant why one would possibly choose to wait for an attorney before speaking to the police, and defendant responded, "I say I could talk cause I had no paid lawyer." According to Dr. Seltzberg defendant's responses in the very least indicated confusion with respect to defendant's understanding of her right to an attorney.

Dr. Seltzberg then asked defendant if she understood that if she was unable to afford to hire a lawyer and she wanted one, a lawyer would be provided by the court to represent her before any questioning by police, and defendant responded, "If I ain't got no lawyer to pay for, they get one for me. If you don't got no lawyer to pay for, they'll get one for me." Defendant could not however explain how or when she would obtain a lawyer, or the meaning of the phrase "before any questioning," other than to state that she has a lawyer now and that she is not paying for him.

When asked why she did not have a lawyer during questioning, defendant told Dr. Seltzberg that after being in Alton Mental Health Center she understood that she had a serious case and that "a person needs a lawyer for a serious case." However, defendant told Dr. Seltzberg that at the time she spoke with police, she did not think her case was serious, but believed that she was going to tell the police what happened and that she would be released because her friend took her there.

Referring to the transcript of the videotaped confession, Dr. Seltzberg also questioned defendant regarding her understanding of the detective's statement that defendant had a right to remain silent. When asked to explain what that meant, defendant stated, "I don't know. I know the other one. Don't go no where. I got to stay there." Dr. Seltzberg believed that defendant was referring to her prior interview with Dr. Seltzberg, where Dr. Seltzberg asked her to explain the difference between "silent," and "remain."

Dr. Seltzberg next questioned defendant regarding her understanding of the concept that anything she says can be used against her in the court of law. Defendant first stated that she did not know what that meant. Then, she indicated that she was trying to think and repeated the phrase "used against me." Defendant finally stated, "Whatever I say that's against me. Whatever they say against me. Whatever I say it's against me." Defendant could not explain, however, how what she states could be used against her.

Dr. Seltzberg then asked defendant what she believed would have happened if she did not make a statement to police. Defendant responded that she would go to jail and that "they'd lock her up." When asked why she thought that, defendant responded that it was based on what a detective had said to her regarding what six other people had said.

Dr. Seltzberg stated that in all of her interviews with defendant she never found defendant to be dishonest or malingering, but in fact found her to be both cooperative and intent on providing the doctor with "the right answers," answers, which Dr. Seltzberg stated, were not always to her advantage.

Based on all of defendant's responses, Dr. Seltzberg opined that defendant's answers reflected that defendant was attempting to repeat terminology that she had learned while at Alton Mental Health Center and in jail, and apply it to what she had been hearing about *Miranda* rights, without any actual comprehension of that terminology. Dr. Seltzberg concluded that defendant had a tendency to indicate that she understands things when she in fact does not. Therefore, Dr. Seltzberg concluded that defendant could not have understood the *Miranda* warnings given to her in March 2004, nor the consequences of providing a statement to police. According to Dr. Seltzberg, although defendant may have understood some of the things that were being said to her in March 2004, it was beyond defendant's capacity to understand more abstract ideas, such as the consequences of abandoning her right to counsel or to remain silent.

On cross-examination, Dr. Seltzberg conceded that when she asked defendant what she would have done if she had an attorney at the police station to help her, defendant responded, "I think I would have done the same thing. I don't know." Dr. Seltzberg also acknowledged that when asked what "used against you" in the context of "anything you say can be used against you in court" meant, defendant responded that it was something "bad."

During Dr. Seltzberg's testimony, the circuit judge interjected to ask questions and have the expert elaborate on her conclusions. Specifically, at one point, the judge asked Dr. Seltzberg whether the mere fact that someone might be mildly mentally retarded means that he or she cannot understand *Miranda* or waive it, and Dr. Seltzberg responded with "no."

Defendant next called Dr. Bruce Frumkin, an expert in forensic psychology, who concurred with Dr. Seltzberg's assessment. Dr Frumkin testified that as part of his evaluation of defendant, he

reviewed numerous documents[11] and conducted a 4 1/2-hour clinical interview of defendant on September 19, 2004, while she was in Cook County jail, and within six months after she had given her videotaped statement to police. The focus of that interview was to evaluate defendant's ability to competently waive her *Miranda* rights in March 2004, when she gave her videotaped confession to police. Dr. Frumkin explained that during the clinical interview, he administered numerous tests on defendant, including: the Wechsler Adult Intelligence Scale (an IQ test); reading and spelling tests; the comprehension of *Miranda* rights test (CMR test); the comprehension of *Miranda* Rights Recognition Test (CMR-R test); the test of memory (TOMM test); the REY 15-item memory test; the Function of Rights in Interrogation test (FRI test); and the Gudjonsson Suggestibility Scales.

Based on his interview, the records he reviewed, and the tests he administered, Dr. Frumkin concluded that it was highly unlikely that defendant could have made a knowing and intelligent waiver of her *Miranda* rights at the time of the police questioning in March 2004.

Dr. Frumkin explained that during his clinical interview of defendant, defendant had "extreme difficulty" expressing herself and understanding questions and concepts. For example, when Dr. Frumkin asked defendant to name the president of the United States, defendant responded "I hear people say George Washington." Dr. Frumkin opined that defendant had probably been asked this question before and had heard someone say "George Bush," but that she had only remembered "George," and then just guessed "George Washington."

Dr. Frumkin also testified that defendant was "very variable" in the answers she provided, and therefore very unreliable. Dr. Frumkin explained that when asked the same question more than once, defendant would give different answers. For example, when Dr. Frumkin asked defendant whether she had ever used illegal drugs, at first defendant said "no, she never used them." Then when asked a second time, defendant responded that she had used marijuana once or twice every month for a number of months. When asked yet a third

---

[11]Dr. Frumkin averred that in evaluating defendant, he reviewed, among other things, the following pertinent records: (1) Dr. Seller's psychological reports and his raw psychological test data, (2) Forensic Clinical Services records including notes and raw psychological test data; (3) the transcript of defendant's videotaped confession; (4) various police reports; (5) materials that defendant had in her possession relating to the legal classes she was taking while in Cook County jail; and (6) all records from Alton Mental Health Center.

time, defendant stated that she only used marijuana four times "all together."

Dr. Frumkin also testified that defendant was very deficient in relaying information about her past. For example, although she told Dr. Frumkin that she had surgery on her chest when she was 16 or 17 years old, she could not explain why she had the surgery or what type of surgery it was.

According to Dr. Frumkin defendant had very poor vocabulary expressing herself, and Dr. Frumkin had to use very simple words and phrases and then repeat them in different ways before defendant was able to understand. Dr. Frumkin also testified that when she did not understand something during questioning, defendant had a tendency to "parrot" information back to an examiner without really understanding it.

Dr. Frumkin also testified that defendant exhibited very poor counting skills, which revealed low intelligence. Specifically when Dr. Frumkin asked defendant if she buys $6 worth of gasoline and pays for it with $10, how much change should she get back, defendant answered "three."

Dr. Frumkin stated that defendant is functionally illiterate. He explained that to test her reading ability, he administered the Wide Range Achievement Test, which revealed that defendant could read only at a second-grade level, *i.e.*, only very simple and very short words.

For purposes of IQ testing, Dr. Frumkin administered the Wechsler Adult Intelligence Scale and defendant scored a full scale IQ of 55, which is in the lower one-tenth of 1% of other adults her age (*i.e.*, 999 out of 1,000 adults her age would be brighter than her). According to Dr. Frumkin, with respect to the verbal score of the IQ test, which is the most relevant to her comprehension of *Miranda* rights, defendant received a score of 58, which placed her in the lower three-tenths of 1% of her age group in terms of verbal intelligence. Dr. Frumkin elaborated on defendant's responses to certain questions in the various subtests of the verbal IQ test. For example as part of the vocabulary subtest, which measures one's knowledge of the meaning of vocabulary words, defendant was asked to define the meaning of the word "yesterday" and responded, "it is when you look in the calendar to see what date it is." Similarly, when asked to define the word "terminate," defendant responded that it means the "movie."

As part of the verbal abstract reasoning skills subtest, defendant was asked to explain how a piano and a drum are alike, and responded that "they sound alike, you can beat on them." When asked how an ear and an eye are alike, she responded that she did not know.

Defendant was also asked "what direction does the sun rise" and she responded "in the middle."

Dr. Frumkin testified that *Miranda* rights are very abstract and that someone with such severe limitations in understanding simpler and more concrete concepts would have a difficult, if not impossible, time understanding and appreciating the significance of *Miranda* rights.

Dr. Frumkin further testified that in September 2004, he administered a series of tests designed to test the subject's current understanding of *Miranda* rights. Dr. Frumkin first administered the CMR and CMR-R tests, designed to test a subject's recognition and comprehension of *Miranda* warnings and was surprised to find that defendant scored well on these tests despite her low IQ. When Dr. Frumkin asked defendant how she knew so much about *Miranda* rights, defendant told him that every Saturday in jail "she went to legal classes where they taught people about the legal system and the rights." Defendant then gave Dr. Frumkin materials and questionnaires from that class. After reviewing these materials, Dr. Frumkin came to the conclusion that defendant's scores on the CMR and CMR-R had been the result of defendant's ability to "parrot" information back to an examiner, information she had memorized from the materials she had been learning concurrently in her class. Dr. Frumkin opined that these tests therefore did not speak to defendant's ability to actually comprehend *Miranda* warnings.

Dr. Frumkin therefore next administered the FRI test, which evaluates a person's ability to intelligently use *Miranda* rights, by reading a series of short stories to defendant about a person being interrogated by police, meeting with an attorney and going to court, and then questioning defendant about her rights. Prior to administering the test, Dr. Frumkin reviewed the *Miranda* warnings with defendant for approximately 30 to 45 minutes. Although Dr. Frumkin acknowledged that defendant did fairly well on the FRI test with respect to her understanding of her right to counsel and the adversarial nature of police, he testified that defendant did "very poorly" with respect to her comprehension and intelligent use of the right to remain silent. Specifically, Dr. Frumkin stated that when asked what would happen to a man who decided to tell the police what had happened, defendant merely responded by repeating "he will tell them what happened." Asked what would happen to the person if the person decided not to talk, defendant responded, "They will hold you until you say something. That's why it's best to tell." Similarly, when asked what would happen if the man did not want to talk, defendant answered, "They're going to lock him up because he's not saying stuff

not talking to them." Finally, when asked what the judge would feel if he found out that a person in custody invoked his or her right to remain silent, defendant responded, "he would be mad." According to Dr. Frumkin, defendant's responses to this portion of the FRI test revealed that at the time of her videotaped confession in March 2004, defendant would not have been able to appreciate the significance of her right to silence so as to understand that she did not have to make a statement to police. In any event, according to Dr. Frumkin "even if [defendant] knew she did not have to speak to the police, which I think is doubtful," she nevertheless believed that she would have to make a statement so that the judge would not "be mad at her." Consequently, Dr. Frumkin concluded that in March 2004, defendant could not have intelligently waived her *Miranda* right to remain silent.

After hearing all of the evidence and watching the videotaped confession, the circuit judge found defendant had knowingly and intelligently waived her rights. In doing so, the judge stated that he did not see how defendant's poor performance on the abstract reasoning test applied to her ability to waive *Miranda*, noting that "as an intelligent person" he would have difficulty defining the similarities between "an ear and an eye" or explaining a proverb such as "between a rock and a hard place." The judge further stated that defendant had received her rights at "every single turn" and that the experts' opinions were a "wash" because the videotape of the confession "clearly indicate[d], without any doubt whatsoever, that [defendant] was advised of her rights, [that] she chose to give a statement, and [that] she did so knowing and understanding what her rights were." The judge also found it unlikely that defendant would have said she understood something if she did not. The judge ultimately concluded that if a proverb was to be used to determine whether defendant had intelligently and knowingly waived her *Miranda* rights, then the following proverb should "be added to the mix: The truth is in the pudding," with the pudding being defendant's own videotaped confession.

## D. State's Motion *In Limine* to Bar Testimony of Dr. Frumkin

Prior to trial, the State moved to bar Dr. Frumkin from testifying about the Gudjonsson Suggestibility Scale (GSS), a test he administered to defendant to determine her "interrogatory suggestibility." This test consists of a story or a series of stories being read to defendant, after which defendant is asked questions regarding the story and is suggested several incorrect or fictional answers regarding what happened in the story. The test measures how easily a subject will agree that fictional or wrong aspects of the story are true, purely in order to please the questioner.

The State argued that the test should not be introduced at trial because it was unfeasible and lacked external validity. The defense asserted that testimony regarding this test had been allowed in several Cook County courtrooms and that the test itself is generally accepted in the psychological community. The defense then proffered the testimony that would be offered by Dr. Frumkin at trial. Dr. Frumkin would testify that defendant had achieved a high score on the GSS test (a 93% out of 100%), which indicates that she is "very suggestible" and that under pressure will yield to incorrect answers. The defense argued that testimony regarding this evidence would be relevant to determining the reliability and the weight to be given to defendant's confession, as well as relevant to her anticipated defenses of compulsion and duress. The circuit court judge disagreed and granted the State's request to bar the testimony regarding the GSS test. In doing so, the circuit court noted that since Dr. Frumkin could not definitively say that police had suggested anything to defendant, the GSS test was inapplicable to a police interrogation situation and was therefore irrelevant in determining the weight to be given to defendant's videotaped statement.

## 2. Bench Trial

Defendant was then tried by the bench, having waived her right to a jury trial. Defendant's bench trial was held simultaneously with codefendant Laquita Calhoun's jury trial. The transcript of the trial proceedings reveals the following pertinent evidence.

### A. State's Case in Chief

As part of its case in chief, the State presented the testimony of three eyewitnesses, Derrick Fleming, Lakesha Collins, and Katherine Calhoun. Derrick Fleming testified that on the evening of February 28, 2004, he went to codefendant Laquita Calhoun's house near 74th Street and Parnell, to look for his girlfriend, Lakesha Collins. Once there, Derrick was told that Lakesha was next door at defendant's house. Together with Laquita, Derrick proceeded to defendant's house, where he saw defendant, Lakesha, Katherine Calhoun and Terrence Jones sitting in the living room. Derrick stated that a few minutes later, the victim, Alonzo Jones came out from one of the back rooms. Derrick had never met Alonzo before, but testified that Alonzo appeared to be mentally challenged because he slurred his words. According to Derrick, Laquita, Lakesha and Katherine then started questioning Alonzo about Laquita's baby, whether he molested or touched her. Alonzo denied the allegations.

Derrick averred that Laquita then hit Alonzo and that Terrence followed by kicking him in the testicles. According to Derrick, a few

minutes later, when Laquita went to the back room, Lakesha opened the front door and told Alonzo to run. Alonzo attempted to escape, but Terrence called to Laquita, telling her that Alonzo was trying to get away. According to Derrick, Laquita ran to the front, grabbed Alonzo by the neck, brought him back inside and threw him down onto the floor. Alonzo remained on the floor for a few seconds, but then got up and ran to the back of the house.

Derrick stated that, at this point, he, Lakesha and Lakesha's seven-year-old son, E.O., left the house to go to Lakesha's apartment. On their way out, Derrick turned around and saw Laquita and Terrence dragging Alonzo back toward the house, with Terrence hitting Alonzo on the upper back with a broom handle. Derrick also testified that, at that point, Alonzo seemed as if he would faint at any moment.

Derrick averred that together with Lakesha and her son, he drove to Lakesha's apartment. Once there, however, Lakesha told Derrick to stay with the boy while she would return to defendant's house to "calm everything down." Derrick testified that he next saw Lakesha on the following afternoon, at 4 p.m., that she was crying and that she told him that "the boy was dead."

Derrick observed that his car, a four-door green Pontiac Grand Prix, had blood on the inside and outside of the trunk, as well as on the antifreeze bottle. Derrick also saw that the spare tire was not in the trunk but that instead of it the trunk contained a can of lighter fluid. Derrick testified that he panicked and took the car to a car wash where he washed off the blood and threw everything from the trunk into a nearby trash can.

Derrick further testified that soon after this incident, he spoke to police, told them what he had witnessed at defendant's house, and led them to the trash can and the car wash where he had attempted to clean out his car. Derrick averred that soon afterwards he spoke to the State's Attorney and gave a handwritten statement.

On cross-examination Derrick testified that when he first observed Alonzo walking into the living room, Alonzo had blood running down his wrists.

Lakesha Collins[12] next testified consistent with Derrick's testimony with respect to what transpired in defendant's apartment. She further added that after dropping Derrick and her son at home, she returned to defendant's apartment in Derrick's car in order to "take the victim to the police station and turn him over to the police."

---

[12]The record reveals that prior to defendant's trial Lakesha Collins pleaded guilty to her involvement in the murder of the victim, Alonzo Jones, and that at the time of her trial testimony she was serving a 20-year sentence.

When questioned about the specifics of the crime, particularly the involvement of defendant and codefendant, Lakesha averred that she could not recall what occurred that night. Although she admitted that she gave police a videotaped statement shortly after the crime, and acknowledged the answers that she then gave to police, she testified that those answers were coached and that she had given them because the police threatened to "lock her up," place her son in foster care, "and bounce him from home to home," as well as "put her boyfriend [Derrick Fleming] away for murder for a long time."

Because of Lakesha Collins' recantations, her videotaped statement was admitted at defendant's trial.[13] In that videotaped statement, Lakesha stated that on February 28, 2004, she was at defendant's home with defendant, Terrence Jones, Derrick Fleming, and Laquita and Katherine Calhoun, when Laquita accused the victim, Alonzo Jones of molesting her baby. According to Lakesha's videotaped statement, Terrence then asked Alonzo if he was "doing that stuff to [the] kid they say he was doing," and that if it was true he would "do it to him [Alonzo]." Even though Alonzo denied having molested the baby, Terrence started beating Alonzo's legs and arms with a broom, and codefendant Laquita kicked Alonzo in the face. Terrence also tried to drive the broomstick up the victim's anus, asking him "why he was messing with kids and do [sic] he want him to show him how it feels [sic]." According to Lakesha's videotaped statement, at this point, defendant was sitting on the bed saying, "He [Alonzo] did it because he did it [sic] before to one of her babies."

In her videotaped confession, Lakesha further stated that when at one point, Laquita and Terrence went to the back of the apartment, she opened the door for Alonzo to escape. Alonzo managed to get downstairs and reach the gangway before he was stopped by Laquita and Terrence, who pushed him back upstairs.

Lakesha stated that she then left the apartment with her boyfriend, Derrick, and her seven-year-old son. Lakesha drove Derrick and her son home, but then proceeded to drive around the neighborhood looking for Laquita's "baby daddy Darrell." Lakesha found Darrell and told him that "someone was fumbling his baby," but Darrell refused to go with her to defendant's apartment.

---

[13]We note that Assistant State's Attorney Jeff Levine testified at trial that he took this statement from Lakesha Collins on March 2, 2004, and that following a conversation that included the reading of her constitutional rights, Lakesha Collins chose to have her statement recorded and videotaped. ASA Levine also testified that Lakesha Collins gave this statement with no inducements, threats or promises.

When Lakesha returned to defendant's apartment, defendant, Laquita, Katherine and Terrence were upstairs in the hallway outside of the apartment. Lakesha told Laquita that Darrell was not coming, so they had to "take Alonzo somewhere else, and somebody else would have to do it." According to Lakesha's videotaped statement, "to get down the stairs, everyone had a piece of Alonzo's body." Specifically, Lakesha told the police that she, defendant and Laquita held the victim's arms, while Katherine and Terrence helped with Alonzo's legs. Lakesha popped the trunk open, and they put Alonzo in the trunk and closed it. Everyone got into the car, and the plan was to kill Alonzo and throw his body into the lake. They drove around for awhile until they stopped at a liquor store, and then Laquita's aunt's house. Lakesha stayed at this house because she fell asleep. The next day, she heard Alonzo had been killed.

Katherine Calhoun also testified on behalf of the State.[14] Katherine Calhoun initially refused to testify for the State, refusing to answer any of the prosecutor's questions. The trial court explained to her that refusal to answer questions merely because she wanted "nothing to do with this" could result in contempt of court proceedings subjecting her to additional and unlimited jail time, in addition to her existing 20-year sentence. When Katherine Calhoun continued to be uncooperative, the trial court found her in contempt. Katherine Calhoun was recalled later in the trial proceedings and questioned regarding her prior videotaped statement to police. Katherine continued to be a reluctant witness, admitting only after substantial prodding that she was in defendant's apartment at the time in issue but refusing to give specifics about codefendant's and defendant's involvement in the crime, except to admit that she did tell the police officers in her videotaped statement that defendant helped her, Lakesha and codefendant Laquita put the victim in Derrick Fleming's car.

Katherine admitted that she gave a videotaped statement to police on March 2, 2004, but stated that she did so only because the police told her that if she made a statement she would be allowed to leave. Katherine averred that many of the statements she made in that videotaped statement were not true and that she made them because she was "scared" and the police "made her say those things" by "yelling at her."

For example, on cross-examination, Katherine averred that there was never a plan to kill the defendant or throw him in Lake Michigan,

---

[14]The record reveals that Katherine Calhoun is the sister of Laquita Calhoun and that at the time of her trial testimony she was serving a 20-year sentence for her involvement in the murder of Alonzo Jones.

and that she made that statement during her videotaped confession because the police "made her do it." Katherine also stated that she lied when she said in her videotaped statement that on the morning following the incident she learned from defendant that Alonzo was dead and that it was the police or the ASA who told her to say that on videotape.

On cross-examination, Katherine also admitted that before this incident, she physically fought with defendant on many occasions and that generally she would win. She also admitted that defendant did not have a telephone or a cell phone in her apartment.

Because Katherine's testimony was inconsistent with her earlier statements to police, Assistant State's Attorney Daniel Tiernan was called to lay the foundation for Katherine Calhoun's videotaped confession, and that confession was admitted into evidence.

In that videotaped statement, Katherine told police that defendant helped her, Lakesha, and Laquita put the victim inside the trunk of Derrick Fleming's car. Once the women all got inside the car, Laquita said that she did not want Alonzo taken to the police station, and that she wanted him dead. The women drove around the south side trying to locate Laquita's "baby daddy" so that Alonzo could be "whooped," but when they were unsuccessful, they drove to a liquor store at 59th Street and State Street instead, where Katherine bought herself a drink. While at the liquor store, Lakesha opened the trunk in front of two or three men that she knew from the neighborhood and told them that she needed help and that "this man molested a baby." When Lakesha opened the trunk, Alonzo was still alive and talking. Katherine heard what sounded like bottles hitting something. At that time, Katherine and defendant were in the backseat of the car.

According to Katherine's videotaped statement, once they left the liquor store, defendant said, "We can go to Lake Michigan." Katherine stated that she did not know what they would do at Lake Michigan, but that she thought that they would "dump him" there. She stated, however, that in response to defendant, Laquita said that she did not want to take Alonzo to Lake Michigan because she wanted him dead. In her videotaped statement, Katherine averred that defendant never stated that she wanted to "dump the body" anywhere, and that defendant was scared, just as Katherine was. According to Katherine, while in the car, defendant also stated that Alonzo had also molested one of her children.

Katherine told police that while they were driving around the south side, she could hear Alonzo pleading from the trunk, "Take me to the hospital. Take me to the police station. Sorry [La]quita, Sorry Jeanette [defendant]." At this point, Laquita responded, "I'm not try-

ing to hear that. You going to die tonight," and defendant chimed in "You shouldn't have did what you did."

According to Katherine's videotaped statement, she left the vehicle before anything else happened. On the following morning, Katherine went to defendant's apartment, where she saw Laquita and defendant. Defendant told Katherine that Alonzo was dead, and Laquita told her that "Navon ran over Alonzo four times" and that she "cut him."

Dr. Mitra Kalelkar, assistant chief medical examiner, next testified that on March 1, 2004, she performed an autopsy on the victim, Alonzo Jones. Dr. Kalelkar testified that the external examination revealed numerous blunt and sharp force injuries on Alonzo's body, as well as gravel marks consistent with a body being run over by a vehicle and being dragged along the road. According to Dr. Kalelkar, the internal examination showed extensive rib fractures, lacerations to the right lung, blood inside the victim's right chest cavity, and hemorrhages underneath the victim's scalp. Dr. Kalelkar concluded within a reasonable degree of scientific and medical certainty that Alonzo Jones died as a result of multiple blunt and sharp force injuries to his body, including crushing injuries of the chest. In her opinion, the manner of death was homicide.

Through stipulation, the State offered evidence that the forensics unit investigating the death of Alonzo Jones recovered five cigarette butts from the ashtray on the rear passenger side of a four-door 1995 Pontiac, later identified as Derrick Fleming's car. Nicholas Richert, a forensic scientist with the Illinois State Police, then testified that defendant's DNA matched the DNA found on one of the cigarette butts. With respect to two additional cigarette butts, defendant "could not be excluded" from the profile. Richert explained that "could not be excluded" is a term used when there is insufficient information to detect an exact match, so that there is only a partial DNA profile. But, on cross-examination, Richert admitted that there was no way of determining when or how the cigarette butts happened to be left in the ashtray of the car.

The State next called Detective Brogan and Assistant State's Attorney Jeff Levine to testify regarding the circumstances of defendant's videotaped statement to police, and both witnesses testified consistently with their prior testimony at defendant's motion to suppress hearing. Defendant's videotaped statement was subsequently admitted into evidence.

In her videotaped statement, defendant stated that on February 28, 2004, she was on the porch of her house with Laquita and that Laquita was upset at Alonzo for "doing something to her baby." Together with Lakesha, Katherine, and Derrick, Laquita went to

confront Alonzo in the upstairs apartment. Laquita was beating Alonzo with a stick, when Terrence walked in. When Laquita told Terrence what had happened, Terrence took the broomstick and tried to sodomize Alonzo, yelling "Feel like what it is to rape a baby." Alonzo kept screaming that he "didn't rape no baby [sic]," but Laquita and Terrence continued to beat him and kick him in the face.

When questioned whether she said something to Alonzo at that point, defendant stated that she told "Alonzo I don't see how you could rape a baby. If you rape a baby you don't do that [sic]. You raped my baby." When asked whether she believed that Alonzo had molested one of her children, defendant responded that she "wasn't sure about that."

According to defendant, Lakesha opened the door so that Alonzo could escape, and Alonzo stumbled trying to make it downstairs. When Laquita returned to the room, she saw that Alonzo escaped and asked Lakesha why she would let Alonzo escape. Lakesha responded, "You trying to beat him." Defendant stated that Laquita, Katherine, Lakesha and Terrence all pushed Alonzo back up the stairs, where Laquita and Terrence started beating him again.

At that point, Lakesha left with her boyfriend, Derrick, but returned about 15 minutes later with the car. According to defendant, Lakesha then told Laquita that she had tried to contact her "baby daddy," but that he said that if they wanted him to do something to Alonzo they would have to bring Alonzo to him.

In her videotaped statement, defendant next acknowledged that when Lakesha and Laquita pushed the victim down the stairs, she helped them. She stated that Lakesha and Laquita then dragged the victim to the car and that she helped them pick him up and put him into the trunk. When asked how she helped carry Alonzo, she said she pulled Alonzo by his shirt, and pointed to her collar.

The women then got into the car with Lakesha driving, Laquita in the front passenger seat, and defendant and Katherine in the backseat. Defendant was next asked whether they had a plan once they all got into the car, and she responded, "Yes, they were going to kill him and drop him in the lake." Defendant stated that they stopped at a liquor store and that Lakesha and Katherine left the car to get a drink. After that they drove around some more, and then Lakesha left. They soon found Navon, who got into the car and agreed to help. According to defendant, Katherine got out of the car, and she remained with Laquita and Navon. The three of them went to fix the tire on the car which "had gotten messed up" when Laquita was driving over a sidewalk. While at the mechanic, the radio was turned up so that no one could hear Alonzo in the trunk. Defendant stated that soon

thereafter, Laquita and Navon dropped her off at her house and that she did not get back into the car.

According to defendant's videotaped statement, when defendant next saw Laquita on the following morning, she asked whether Alonzo was "ok," and Laquita responded "No, he dead [*sic*]."

## B. Defendant's Case in Chief

During trial, defense counsel's theory was that because of her mental disability and her living situation, defendant had acted under compulsion and duress. In support of this theory, defense counsel first called Kisha Daniels, defendant's sister. Kisha testified that defendant had a learning disability and that she could only read and write short two- or three-letter words. Kisha averred that defendant lived with her three children[15] at 7425 South Parnell and that she supported herself from social security checks, which she received because of her learning disability. According to Kisha, defendant did not have a telephone in her house. Kisha stated that she visited her sister five to six times a week to help her with responsibilities and to take her shopping because defendant could not drive.

Kisha testified that prior to the incident on February 28, 2004, defendant had complained to her about her neighbors (specifically Lakesha Collins and Katherine Calhoun) and told Kisha that she was "scared" of them. Kisha further averred that when she visited defendant's house in February 2004, she observed that defendant acted differently when her neighbors aggregated in her home. According to Kisha, defendant appeared to be more docile and quiet.

Kisha also testified that on March 2, 2004, she received a telephone call from the Chicago police department asking her to come to the police station and pick up defendant's children because defendant was helping the police with an investigation. When Kisha arrived at the police station, she did not go inside because she observed Katherine Calhoun and became "scared." The circuit judge *sua sponte* sustained an objection to this line of questioning and struck the answer from the record as irrelevant.

In support of her case in chief, the defense also stipulated that if called to testify, Dr. Bruce Frumkin, an expert in forensic and clinical

---

[15]We note that the record is unclear with respect to how many children defendant has. While defendant stated in her videotaped confession that she has five children with whom she lives, Katherine Calhoun stated that defendant has three to four children, Kisha Daniel testified that defendant had three children "with her" at 7425 South Parnell, and Detective Brogan testified that defendant came to the police station on March 1, 2004, with three small children.

psychology, would testify consistently with his testimony at defendant's motion to suppress hearing.

At the close of the evidence, the parties waived closing arguments. The circuit court found defendant guilty of six counts of aggravated kidnaping. In doing so, the trial judge noted that based on the evidence presented at trial, "legally speaking," defendant was guilty of murder because she participated in placing the victim in the trunk. However, relying on the principle of judicial lenity, the trial judge found defendant guilty of aggravated kidnaping. Defendant was subsequently sentenced to 14 years' imprisonment, a sentence 8 years higher than the statutory minimum.[16] Defendant now appeals.

## III. ANALYSIS

On appeal, defendant makes two contentions. She first asserts that the trial court erred in denying her motion to suppress her videotaped confession. Alternatively, defendant contends that the trial court erred in barring the testimony of defense expert, Dr. Bruce Frumkin, at trial, regarding the tests he administered to defendant to assess her "interrogatory suggestibility." We first address defendant's contention with respect to her motion to suppress her statements.

Defendant contends that her videotaped confession should have been suppressed because she did not validly waive her right to remain silent and the attendant right to the presence of an attorney. Specifically, defendant claims that she lacked the mental capacity to understand the *Miranda* warnings she received and thus could not have knowingly and intelligently waived her constitutional rights. We agree.

In reviewing a trial court's decision as to whether defendant's confession was voluntary, we apply a bifurcated standard of review. Although we review *de novo* the ultimate question of whether the confession was voluntary, because the subissue of whether a *Miranda* waiver was knowing and intelligent is factual, we review it under a manifest weight of the evidence standard. *In re G.O.*, 191 Ill. 2d 37, 50, 727 N.E.2d 1003, 1010 (2000).

■ It is axiomatic that before a defendant's confession can be admitted at trial, the State must prove by a preponderance of the evidence that defendant validly waived her privilege against self-incrimination and her right to counsel. *In re W.C.*, 167 Ill. 2d 307, 327, 167 N.E.2d 908, 919 (1995); see also *People v. Redmon*, 127 Ill. App. 3d 342, 347, 468 N.E.2d 1310, 1314 (1984), citing *Miranda v. Arizona*,

---

[16]In that respect, we note that the statutory range for aggravated kidnaping, a Class X felony, is between 6 and 30 years' imprisonment. See 720 ILCS 5/10—2 (West 2002); 730 ILCS 5/5—8—1 (West 2002).

384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628 (1966). In order to be valid, defendant's waiver of *Miranda* rights must be made knowingly and intelligently, *i.e.*, reflect an intentional relinquishment or abandonment of a known right or privilege. See *People v. Braggs*, 209 Ill. 2d 492, 514, 810 N.E.2d 472, 486 (2003), citing *People v. McClanahan*, 191 Ill. 2d 127, 137, 729 N.E.2d 470 (2000) ("Waivers *** must be knowing and intelligent acts in the sense that they are done with sufficient awareness of the relevant circumstances and likely consequences"); see also *Redmon*, 127 Ill. App. 3d at 346-47, 468 N.E.2d at 1314, citing *People v. Prim*, 53 Ill. 2d 62, 67, 289 N.E.2d 601 (1972) ("The prophylactic warnings required under *Miranda* contemplate more than a mere ritualistic recital of words meaningless to the accused. Rather, an intelligent conveyance of the accused's rights is mandated"); *People v. Bernasco*, 138 Ill. 2d 349, 360, 562 N.E.2d 958, 960 (1990) (noting that to be a valid waiver of constitutional rights, the accused must possess " ' "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." ' [Citation.]").

The crucial test to be used in determining whether an accused knowingly and intelligently waived her rights is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of her rights. *W.C.*, 167 Ill. 2d at 329, 167 N.E.2d at 919-20. As our supreme court aptly explained in *Bernasco*, 138 Ill. 2d at 363, 562 N.E.2d at 964:

> "If intelligent knowledge in the *Miranda* context means anything, it means the ability to understand the very words used in the warnings. It need not mean the ability to understand far-reaching legal and strategic effects of waiving ones' right, or to appreciate how widely or deeply an interrogation may probe, or to withstand the influence of stress or fancy; but *to waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail.*" (Emphasis added.)

Whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of each case, including the defendant's background, experience and conduct. *Braggs*, 209 Ill. 2d at 515, 810 N.E.2d at 487.

In examining the facts and circumstances of a purported waiver of a defendant's constitutional rights, the courts of this state have long recognized that a defendant's mental capacity at the time of the waiver must be considered in determining whether her actions were knowing and intelligent. See *W.C.*, 167 Ill. 2d at 328, 167 N.E.2d at 919 ("The

mental state that is necessary to validly waive *Miranda* rights involves being cognizant at all times of the State's intention to use one's statements to secure a conviction and of the fact that one can stand mute and request a lawyer"); see also *People v. Turner*, 56 Ill. 2d 201, 205, 306 N.E.2d 27, 30 (1973) (holding that while a defendant's limited mental or intellectual capacity at the time of a confession, in and of itself, does not render a statement unintelligent or establish that defendant was incapable of waiving *Miranda*, it is nonetheless a factor which must be considered in the totality of the circumstances under which the right to counsel was waived or a statement or confession was given). Moreover, our courts have repeatedly held that "[t]he greatest care" must be exercised when evaluating the confessions of youthful or mentally deficient defendants, so as to assure that any incriminating statements made by such individuals were not "the product of ignorance of rights or of *** fantasy, fright or despair." *W.C.*, 167 Ill. 2d at 328, 167 N.E.2d at 919; *In re Gault*, 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967); see also, *e.g., Turner*, 56 Ill. 2d at 205, 306 N.E.2d at 30; *In re M.W.*, 314 Ill. App. 3d 64, 731 N.E.2d 358 (2000). As the supreme court in *Braggs* explained:

> "[I]t is generally recognized that the mentally retarded are considered more susceptible to police coercion or pressure than people of normal intellectual ability, they are predisposed to answer questions so as to please the questioner rather than to answer accurately, they are more likely to confess to crimes they did not commit, they tend to be submissive, and they are less likely to understand their rights." *Braggs*, 209 Ill. 2d at 514, 810 N.E.2d at 486, citing M. McCloud, G. Shepard, A. Barkoff & J. Sure, *Words Without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects*, 69 U. Chi. L. Rev. 495, 503, 538 (2002), and P. Hourihan, *Earl Washington's Confession: Mental Retardation and the Law of Confessions*, 81 Va. L. Rev. 1471, 1473 (1995) ("Mentally retarded persons are more susceptible to coercion, more likely to confess falsely, and less likely to understand their rights than people of normal intellectual ability").

In the present case, the trial judge found that defendant had knowingly and intelligently waived her rights. In doing so, the judge stated that he did not see how defendant's poor performance on the abstract reasoning test applied to her ability to waive *Miranda*, noting that "as an intelligent person," he would have difficulty defining the similarities between "an ear and an eye," or explaining a proverb such as "between a rock and a hard place." The judge further stated that "there was no question" that defendant had received her rights at "every single turn possible," and that the experts' opinions with

respect to whether defendant had knowingly and intelligently waived those rights were a "wash." Specifically, the judge stated:

"Dr. Seltzberg and Dr. Frumkin indicate in their opinion she could not, Dr. Nadkarni in his opinion, gave his opinion that she could. So basically even though it's two to one version of [*sic*] the defense, version of the State, it's not the numbers, it's what they have to say. That, in my opinion, is basically a wash. Experts have their opinions. They're entitled to their opinion."

The trial judge next found that the videotape of defendant's confession itself "clearly indicate[d], without any doubt whatsoever, that [defendant] was advised of her rights, [that] she chose to give a statement, and [that] she did so knowing and understanding what her rights were." The judge found it unlikely that defendant would have stated in her videotaped confession that she understood her *Miranda* rights if she had in fact not. As the judge stated:

"And the doctors say well, the mere fact that she answered yes, she understood didn't mean yes, she understood. I still have a difficult time accepting that a person can answer a question without knowing what the question is.

You have a right to remain silent, do you understand that, Jeanette? What does that mean? That's not a response. The response is yes, I do. You have a right to have an attorney present, do you understand that? What would her response be, what does that mean? I don't know what that means. Her response is yes, I do."

The judge ultimately concluded that if a proverb was to be used to determine whether defendant had intelligently and knowingly waived her *Miranda* rights, then the following proverb should "be added to the mix: The truth is in the pudding," with the pudding being defendant's own videotaped confession.

■ For the reasons that follow, and based on the record before us, we find that the trial court's decision was against the manifest weight of the evidence.

In that respect, we first note that the undisputed facts in the record militate against the trial court's finding that defendant knowingly and intelligently waived her rights. It is undisputed that defendant has a full-scale IQ somewhere between 55 and 64 on the Wechsler Adult Intelligence Scale. Defendant initially scored 55 on the IQ test administered to her in 2004 by Dr. Frumkin, soon after her arrest and videotaped confession to police. This score placed defendant in the lower one-tenth of 1% of other adults her age (*i.e.*, 999 out of 1,000 adults her age were brighter than her). Based on her performance on the Wide Range Achievement Test, defendant is "functionally illiterate" and can read only very simple and very short two- to

three-letter words, *i.e.*, she has the reading capabilities of a second grader. Defendant has problems retaining information and is incapable of memorizing and recalling three items during a conversation. Defendant has problems identifying the president of the United States and performing complex counting, addition or multiplication. Defendant is capable of concrete rather than abstract thought. Defendant has attended special education classes throughout her life, and she receives social security disability checks based on her mental disability. Prior to this incident, defendant had had no contact with the criminal justice system.

The record further establishes that defendant was initially found unfit to stand trial because of her limited cognitive functioning, and her inability to understand the roles of different court personnel (including the judge, the assistant State's Attorney, and the public defender), general courtroom proceedings, or the possible outcomes of her case. The record further reveals that upon her admission to Alton Mental Health Center for treatment, defendant was diagnosed by two expert forensic psychiatrists, Dr. Seltzberg and Dr. Montani, as suffering from "mild mental retardation," because her IQ was below 70, with an onset prior to age 18, and she exhibited poor social adaptive skills, with a functional equivalent of an eight-year-old child. The record also reveals that at this time defendant was diagnosed with schizo-affective disorder of the depressed type, exhibiting symptoms of psychosis, such as hearing voices, and that she was placed on antipsychotic medication.

The record further establishes that defendant was evaluated for her understanding of *Miranda* rights on at least four separate occasions: (1) in 2004 by clinical psychologist Dr. Frumkin; (2) in October 2005 by Dr. Seltzberg, a staff forensic psychiatrist; (3) in February 2006 again by Dr. Seltzberg; and (4) in March 2006 by staff forensic psychiatrist Dr. Nadkarni. Each of these evaluations, including that of the State's expert, Dr. Nadkarni, calls into doubt defendant's ability to comprehend all of her *Miranda* rights.

When first evaluated by Dr. Frumkin in September 2004, only six months after her arrest and videotaped confession, defendant continued to exhibit an inability to understand and intelligently waive her right to remain silent, despite the training and class instructions regarding her *Miranda* rights that she was concurrently receiving in jail. Specifically, Dr. Frumkin testified that with respect to the right to remain silent defendant scored poorly on the FRI test, which is a test designed to assess a subject's current ability to intelligently and knowingly use her *Miranda* rights, by reading a series of short stories to defendant about a person being interrogated by police, meeting with

an attorney and going to court, and then questioning defendant about her rights, including the right to remain silent. Prior to administering the test, Dr. Frumkin reviewed each of the *Miranda* warnings with defendant for approximately 30 to 45 minutes. He then proceeded to read a series of short scenarios to defendant and ask her to respond to each. When Dr. Frumkin asked defendant what would happen to a man who decided to tell the police what had happened, she merely responded by repeating "he will tell them what happened." Asked what would happen to the person if the person decided not to talk, defendant responded, "They will hold you until you say something, that's why it's best to tell them what happened." Third, when asked what would happen if the man did not want to talk, defendant answered, "They're going to lock him up because he's not saying stuff not talking to them." When asked how the judge would feel if he found out that a person in custody had not spoken to police and had invoked his right to remain silent, defendant responded, "he would be mad."

The record reveals that when defendant was next evaluated by Dr. Seltzberg in October 2005, 19 months after her arrest and her videotaped confession, defendant continued to exhibit a lack of understanding of her right to remain silent and did not comprehend the difference between the words "silent" and "remain." Specifically, as already noted above, when asked what a right to remain silent means, defendant first responded "Go to jail." When asked "why it means to go to jail," defendant responded, "Because of the statement I said." After Dr. Seltzberg continued to question defendant about the meaning of the "right to remain silent," by using simpler terms and breaking up the question, defendant at one point stated, "I could talk or I don't have to talk." However, when Dr. Seltzberg asked defendant how she knew this, defendant responded "I was just guessing, is that right?" Dr. Seltzberg inquired why defendant had been guessing, but defendant just laughed. Dr. Seltzberg continued questioning defendant by asking her "what does the word remain mean," and defendant responded "just be quiet," and "you don't say nothing." When Dr. Seltzberg asked defendant what "silent" means, defendant answered "you don't say nothing." Dr. Seltzberg then asked defendant whether "remain" means the same as "silent," and defendant responded, "No. Remain is you got to [*sic*] talk."

The transcript of the motion to suppress hearing further reveals that when next evaluated for a second time by Dr. Seltzberg in February 2006, nearly two years after her arrest and videotaped confession, defendant continued to exhibit an inability to understand her right to remain silent. Specifically, when asked what the detective had meant

when he had told her that she had a right to remain silent, defendant responded, "I don't know. I know the other one. Don't go no where. I got to stay there." Dr. Seltzberg believed that defendant was referring to her prior interview with Dr. Seltzberg, where Dr. Seltzberg asked her to explain the difference between "silent" and "remain." Dr. Seltzberg then tried to simplify the question for defendant and asked her what she believed would have happened to her if she did not make a statement to police. Defendant responded that she would go to jail, and that "they'd lock her up."

The transcript further reveals that even when evaluated by the State's expert, Dr. Nadkarni, for the first time in March 2006, two years after her videotaped confession, and after receiving instruction on *Miranda* warnings both while in jail and during her six-month stay at Alton Mental Health Center, as well as hearing repeated explanations of those warnings during previous evaluations by Dr. Seltzberg and Dr. Frumkin, defendant could nevertheless still not recite the *Miranda* warnings on her own and continued to exhibit confusion regarding her right to remain silent. Specifically, Dr. Nadkarni testified that when asked what her *Miranda* rights were, defendant replied, "You got to tell us what happened. Do you need a lawyer?" Similarly, although when read the right to remain silent from an F.O.P. book and asked to explain it, defendant first stated "you could be quiet or you could talk," when questioned to explain the meaning of the word "right," defendant responded "you could talk."

Although Dr. Nadkarni's opinion differed from that of Dr. Frumkin and Dr. Seltzberg with respect to defendant's ultimate ability to understand *Miranda* warnings, all three recognized that defendant's thinking functions at a more concrete and linear, rather than abstract level, and that understanding *Miranda* warnings requires at least some degree of abstract reasoning capacity.

Moreover, both Dr. Seltzberg and Dr. Frumkin, who opined that defendant would not have been capable of understanding her *Miranda* rights, explained that any appearance of defendant's current comprehension of her *Miranda* rights was a result of defendant's attempt to repeat and apply terminology that she had learned while in jail and at Alton Mental Health Center, without any actual understanding of that terminology. Specifically, Dr. Frumkin and Dr. Seltzberg agreed that defendant has a tendency to "parrot" things that she has heard without comprehension and to state she understands something when in fact she does not. This conclusion is supported by defendant's social history, prepared by social worker Edwards, which reveals that defendant's family members confirm that defendant "would not make it known when she did not understand something."

Consequently, in light of the testimony of the court-appointed experts and after viewing the videotaped confession, we are compelled to disagree with the findings of the trial judge and the ruminations upon which these findings are premised. See, *e.g.*, *Turner*, 56 Ill. 2d at 205-07, 336 N.E.2d at 30-31 (reversing the trial court's denial of defendant's motion to suppress his confession based on defendant's inability to intelligently and knowingly waive his *Miranda* rights where the totality of the evidence revealed that the 25-year-old defendant had an IQ of 70, which placed him in the lower 10% of the general population); see also *Redmon*, 127 Ill. App. 3d at 347-50, 468 N.E.2d at 1314-16 (reversing the circuit court's denial of defendant's motion to suppress his confession based on defendant's inability to comprehend *Miranda* warnings, where the totality of evidence established that the 17-year-old defendant had an IQ of 70 or 71 which placed him in the lower 10% of the general population, and a reading ability of a fifth grader); *M.W.*, 314 Ill. App. 3d at 69-71, 731 N.E.2d at 361-63 (affirming the decision of the circuit court to suppress defendant's confession where the totality of the circumstances revealed that defendant lacked the mental capacity to understand *Miranda* warnings because: (1) he was 13 years old, (2) had a full scale IQ between 52 and 54, which placed him in the borderline mentally retarded range of intellectual functioning, (3) had the reading and spelling level of a second grader, (4) had a history of being in special education classes, (5) in psychiatric evaluations exhibited concrete rather than an abstract thinking, and (6) could not explain the difference between "right" or "silent"); *Braggs*, 209 Ill. 2d at 513-19, 810 N.E.2d at 486-88 (reversing the trial court's denial of defendant's motion to suppress based on defendant's inability to understand her *Miranda* warnings, where the circumstances revealed that the 29-year-old defendant had an IQ of 54, suffered from moderate mental retardation, had no prior contact with the criminal justice system, and had been initially found unfit to stand trial).

The State nevertheless contends that it was the province of the trial court to accept or reject the testimony of the expert witnesses and to credit Dr. Nadkarni's opinion with as much weight as that of Dr. Seltzberg and Dr. Frumkin, disregarding all three opinions as "a wash." We disagree.

Although we acknowledge that in making its determination, "a trier of fact is free to accept the opinion of one expert witness over another" (*People v. Baker*, 253 Ill. App. 3d 15, 27, 625 N.E.2d 719, 727 (1993)), the relative weight to be given an expert witness's opinion is "measured by the reasons given for the conclusion and the factual details supporting it" (*People v. Wilhoite*, 228 Ill. App. 3d 12, 20-21,

592 N.E.2d 48, 53-54 (1991)). The opinion of an expert is of value only when it is based upon and in harmony with facts which are capable of verification by the court. *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.*, 12 Ill. App. 3d 165, 179, 298 N.E.2d 289 (1973); accord *Wilhoite*, 228 Ill. App. 3d at 21, 592 N.E.2d at 53. As this appellate court articulated in *Wilhoite*:

"If the expert's opinion is without proper foundation, particularly where he fails to take into consideration an essential factor, that opinion 'is of no weight, and must be disregarded.' 32 C.J.S. *Evidence* §569(1), at 609 (1964), ('[e]xpert testimony is of no weight, and must be disregarded, when it is contrary to common sense ***, undisputed facts ***, or where the opinion admits ignoring much of the best evidence available'), citing, *e.g.*, *Kentucky-Tennessee Light & Power Co. v. Fitch* (1946), 304 Ky. 574, 201 S.W.2d 702; see also 32 C.J.S. *Evidence* §569(2), at 616 n.38 (1964), citing *Marshall v. Sellers* (1947), 188 Md. 508, 53 A.2d 5 (if any essential facts have been overlooked, the weight of the expert's opinion is thereby weakened or destroyed)." *Wilhoite*, 228 Ill. App. 3d at 21, 592 N.E.2d at 54.

In the present case, the trial judge gave no reason for rejecting the experts' testimony. Rather, the record demonstrates that the trial judge was dismissive of the questions posed by all three experts in evaluating defendant's cognitive abilities, insisting that these questions would have stymied him as well. For example, in making his finding, the trial judge made the following interspersed comments:

"Proverbs, she was asked questions about proverbs at various times. One of the questions she was asked along the way was what do you understand the phrase to mean, you put me between a rock and a hard place. She didn't apparently understand what that meant.

I think I'm fairly intelligent, I'm not sure quite sure what it means myself in total, between a rock and a hard place. Probably it means you have a bad choice on either end, between a rock and a hard place.

But the fact that someone does not understand that, I don't think it adds much to whether they understand *Miranda* warnings, if they've waived them intelligently.

\* \* \*

She's asked a question ***: in what way are an eye and an ear alike; she says she didn't know. In what way are an eye and an ear alike. I'm not sure what the answer to that question is myself.

I suppose you can say they're senses, they're part of the body, but other than that, they don't look alike, they have different functions. So a person might say how are they alike, I don't know, an eye and an ear, how are they alike.

In reviewing the testimony of the various people that testified— and we were talking about a proverb before, the difference between a rock and a hard place. Add this proverb into the mix: the truth is in the pudding."

Apart from these disparaging comments regarding the standardized screening tests used to evaluate defendant's cognitive abilities, the trial court did not appear to give any meaningful weight to the tests specifically administered by all three experts to determine defendant's ability to comprehend her *Miranda* warnings (including, among other things, the experts' interviews regarding *Miranda* warnings and the FRI test administered by Dr. Frumkin, whose efficacy itself was not disputed by Dr. Nadkarni). In this respect, " 'it does not seem that the court questioned the credibility of the [experts], but rather that it drew different conclusions than they did.' " *Baker*, 253 Ill. App. 3d at 28, 625 N.E.2d at 727, quoting *People v. Arndt*, 86 Ill. App. 3d 744, 749, 408 N.E.2d 757 (1980).

Moreover, here, contrary to the trial court's conclusion, the record is replete with evidence of the shortcomings of Dr. Nadkarni's evaluation, which failed to consider or examine relevant authorities and/or information concerning defendant, including information contrary to his opinion, so as to render that opinion less credible than that of the other two experts. See *Wilhoite*, 228 Ill. App. 3d at 21, 592 N.E.2d at 53-54; see also *People v. Williams*, 201 Ill. App. 3d 207, 218, 558 N.E.2d 1258 (1990) (holding that expert's intentional disregard of certain records, including social histories to find facts relevant to his final diagnosis, and his statement that they were not important to his final opinion, undermined his credibility); see also *People v. Jackson*, 170 Ill. App. 3d 77, 82, 522 N.E.2d 577 (1987) (holding that an expert's concession that he ignored information contrary to his opinion undermined his credibility).

The record reveals that Dr. Nadkarni conceded that in evaluating defendant nearly two years after her confession, and after she had already received instruction and training on her *Miranda* rights both in jail, and at Alton Mental Health Center, as well as during her discussions with Dr. Frumkin and Dr. Seltzberg, he did not review Dr. Frumkin's 2004 report, which was closest in time to the date of defendant's actual videotaped statement, and which explained that despite defendant's ability to "parrot" information, defendant's scores on the FRI test firmly established that defendant lacked the intelligence and the ability to understand her right to remain silent. Morever, had Dr. Nadkarni reviewed Dr. Frumkin's 2004 report, he would not have been oblivious, as he was, to the fact that defendant told Dr. Frumkin that while in jail she was taking classes on the subject of her

*Miranda* rights. Consequently, Dr. Nadkarni made no effort to account for that period of instruction in retroactively evaluating defendant's ability to comprehend *Miranda* at the time of her videotaped confession before any such instruction took place.

Dr. Nadkarni also conceded that in evaluating defendant's understanding of *Miranda* rights, unlike Dr. Frumkin (who spent 4.5 hours with defendant) and Dr. Seltzberg (who evaluated defendant on three separate occasions), he neither used the standard FRI test, which is used to evaluate a person's ability to understand and intelligently use her *Miranda* rights, nor probed defendant's responses to determine her comprehension, rather than her ability to simply memorize her *Miranda* rights. Instead, during his relatively short 1½-hour interview of defendant, Dr. Nadkarni merely read the *Miranda* rights to defendant from an F.O.P. book and asked her to repeat them in her own words. When asked why he did not use any of the standard techniques employed by either Dr. Frumkin or Dr. Seltzberg, to probe defendant's comprehension of individual *Miranda* rights, Dr. Nadkarni simply stated that he did not feel he "needed to" because defendant never indicated that she did not understand or follow him. This statement reflects a failure by Dr. Nadkarni to take into account the social history of defendant, which revealed that defendant had a tendency to "not make it known that she did not understand something," and whose validity and relevancy Dr. Nadkarni never disputed.

In addition, although not in itself compelling, we note that Dr. Nadkarni has far less experience than either Dr. Frumkin or Dr. Seltzberg. See, *e.g., People v. Smith*, 253 Ill. App. 3d 443, 451, 624 N.E.2d 836, 853 (1993) ("the extent of a[n] [expert] witness' knowledge or degree of his experience goes to the weight accorded his testimony, not to his competency to testify"). The record reveals that Dr. Nadkarni has been employed as a staff psychiatrist at the circuit court for only two years and is not yet board certified in forensic psychiatry. On the other hand, Dr. Seltzberg is a board-certified forensic psychologist and has worked for the circuit court for over 15 years. Similarly, Dr. Frumkin has been a clinical psychologist for nearly 30 years and is a diplomatic in forensic psychology, a qualification possessed by only about 180 doctors in the United States.

Consequently, under the aforementioned record, we cannot find any basis upon which to predicate the transcendency of the judge's lay opinion over that of the court's own appointed experts, nor do we find any justifiable grounds to give greater ascendency to Dr. Nadkarni's testimony over that of the other two experts, given the obvious deficiencies in the bases of Dr. Nadkarni's opinion already discussed

above. See *Wilhoite*, 228 Ill. App. 3d at 20-21, 592 N.E.2d at 53-54; see also *Baker*, 253 Ill. App. 3d at 28, 625 N.E.2d at 727. As previously noted, this was not a case where the trial judge questioned the integrity of any of the expert witnesses, nor a case where the judge called into doubt the general acceptance within the relevant scientific discipline of the tests employed by either Dr. Seltzberg or Dr. Frumkin in making their evaluation. Rather the trial judge apparently chose to formulate his opinion based upon his own conceptualization of what it would take to establish sufficient comprehension of the import of *Miranda* warnings and chose to rely on defendant's videotaped statement and her answers of "yes" to questions regarding her understanding of *Miranda* warnings without probing into defendant's ability to understand the questions to which her answers were directed.

As the trial court stated in its finding:

"The videotaped statement of Jeanette Daniel [defendant] clearly indicates without any doubt whatsoever that she was advised of her rights, she chose to give a statement, and she did so knowing and understanding what her rights were.

\* \* \*

And the doctors say well, the mere fact that she answered yes, she understood didn't [*sic*] mean yes, she understood. I still have a difficult time accepting that a person can answer a question without knowing what the question is.

You have a right to remain silent, do you understand that, Jeanette? What does that mean? That's not a response. The response is yes, I do. You have a right to have an attorney present, do you understand that? What would her response be, what does that mean? I don't know what that means. Her response is yes, I do."

Contrary to the trial court's conclusion, the videotape of defendant's confession provides little if any insight into defendant's ability to comprehend *Miranda* warnings. Our review of the videotaped statement reveals that at the introduction of the interview, ASA Levine quickly asked defendant if he and Detective Brogan had previously advised defendant of her constitutional rights and whether ASA Levine had explained to her that he was a State's Attorney and that he was not there to represent her rights. Defendant simply says "yes" to each question. The videotaped statement next reveals ASA Levine reciting the *Miranda* warnings to defendant, without defining them in simpler terms, and asking defendant if she understands each right. Again, defendant merely responds with "yes" to each question. Defendant is next asked if she has gone through these rights with ASA Levine "several times," and has nevertheless agreed to speak with police, and she again responds with "yes."

We reiterate that our supreme court has made clear that a defendant's affirmative responses to questions regarding her understanding of *Miranda* warnings are of little value where defendant lacks the ability to understand those warnings. See *W.C.*, 167 Ill. 2d at 334, 657 N.E.2d at 922 ("if one lacks [the] ability [to understand *Miranda* warnings] the repetition of the advice even accompanied by a statement of agreement indicates very little"). As our supreme court explained in *Turner*:

> "The purpose of advising an accused of his rights is to enable him to make an intelligent decision, and to understand the consequences of that decision, and the fact that the advice was iterated and reiterated, and that he said he understood it, is of little consequences unless the defendant was possessed of the intelligence to understand the admonition. Although there is no doubt that defendant was advised of his rights as mandated by [*Miranda*], the question presented by this record is whether he knowingly waived those rights." *Turner*, 56 Ill. 2d at 205, 306 N.E.2d at 30.

Moreover, as already discussed in more detail above, Dr. Frumkin and Dr. Seltzberg both explained that defendant's apparent understanding of her *Miranda* rights could be explained by defendant's tendency to "parrot" things that she has heard without comprehension, and to state that she understands something when in fact she does not.

If anything, the videotape of defendant's confession reflects defendant's inability to understand complex terminology, or respond to questions regarding such terminology with more than simple, one-word responses, exemplified by the following colloquy in the videotape, when defendant was questioned regarding the voluntariness of her statement:

> "ASA Levine: Are you giving this statement freely and voluntarily?
>
> Defendant: What's that mean?
>
> ASA Levine: Why are you giving this statement?
>
> Defendant: Ummmm.
>
> ASA Levine: You want to cooperate?
>
> Defendant: Yes.
>
> ASA Levine: You told me before that you are giving this statement because you want to cooperate? You want to get this off your chest?
>
> Defendant: Yes."

Accordingly, under the aforementioned record, we are unable to conclude that the trial court's finding is supported by the manifest weight of the evidence. See *Turner*, 56 Ill. 2d at 205-07, 306 N.E.2d at 30-31; *Redmon*, 127 Ill. App. 3d at 347-50, 468 N.E.2d at 1315-16;

*Braggs*, 209 Ill. 2d at 513-19, 810 N.E.2d at 486-89; accord *M.W.*, 314 Ill. App. 3d at 69-71, 731 N.E.2d at 361-63.

The State contends that even if erroneously admitted, the introduction of defendant's videotaped confession into evidence at trial constitutes harmless error. We disagree.

We first note that in determining whether an error is harmless, the reviewing court considers whether the State has established beyond a reasonable doubt that the trial court's error did not contribute to the verdict obtained. *People v. Patterson*, 217 Ill. 2d 407, 428, 841 N.E.2d 889, 902 (2005); see also *People v. St. Pierre*, 122 Ill. 2d 95, 113-14, 522 N.E.2d 61, 68 (1988), citing *Chapman v. California*, 386 U.S. 18, 23, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827 (1967) ("[i]n order for an error to be held harmless, a reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction"). To determine whether an error is harmless, " 'it is necessary to review the facts of the case and the evidence at trial' to determine the effect of the unlawfully admitted evidence 'upon the other evidence adduced at trial and upon the conduct of the defense.' " *St. Pierre*, 122 Ill. 2d at 114, 522 N.E.2d at 68-69, quoting *Fahy v. Connecticut*, 375 U.S. 85, 87, 11 L. Ed. 2d 171, 173-74, 84 S. Ct. 229, 230-31 (1963); see also *Patterson*, 217 Ill. 2d at 428, 841 N.E.2d at 902 (acknowledging three different approaches available to a reviewing court in determining whether an error is harmless: (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence).

In the present case, the error in admitting defendant's videotaped confession into evidence at trial was very likely to have contributed to defendant's conviction, since that videotaped confession was the principle evidence of her guilt. In that respect, we note that our courts have repeatedly held that "[b]ecause confessions frequently constitute the most persuasive evidence against a defendant, 'the admission of an unlawfully obtained confession rarely is harmless error.' " *People v. Clay*, 349 Ill. App. 3d 24, 30, 811 N.E.2d 276, 282 (2004), quoting *St. Pierre*, 122 Ill. 2d at 114, 522 N.E.2d at 69 ("Confessions carry 'extreme probative weight,' and therefore the admission of an unlawfully obtained confession rarely is harmless error"); see also *People v. R.C.*, 108 Ill. 2d 349, 356, 483 N.E.2d 1241, 1245 (1985) ("[A] confession is the most powerful piece of evidence the State can offer, and its effect [on the trier of fact] is incalculable").

We cannot, by any means, conclude that defendant's videotaped confession had no impact upon the determination of the trier of fact. The record reveals that apart from defendant's videotaped confession, the only evidence of defendant's participation in the crime, came from (1) equivocal videotaped statements of two codefendants, Lakesha and Katherine, which were recanted at trial; (2) the presence of defendant's DNA on a cigarette butt found inside Derrick Fleming's car; (3) Derrick Fleming's testimony that defendant was present inside the apartment while the other codefendants beat and sodomized the victim; and (4) testimony of Detective Brogan that defendant came to the police station and stated that "something bad" happened at her house, that she was "involved" and that she knew what happened to the victim.

With respect to the codefendants' videotaped statements, we first note that both Lakesha and Katherine recanted their videotaped statements at trial, asserting that they were the result of police coercion. Without defendant's admission, there would be no corroboration for those recanted videotaped statements. Moreover, there was undisputed testimony offered at trial that defendant had been threatened by the codefendants, so as to imply animosity on part of the codefendants in making their initial videotaped statements to police.

With respect to the remaining testimony, we note that contrary to the State's assertion, absent defendant's confession outlining her involvement in the kidnaping, evidence that defendant was present inside the apartment or Fleming's car or that she told the police that she was somehow "involved" would not necessarily have brought about a finding of guilt, since the trier of fact could have concluded that she was "merely present" without sufficient participation to warrant a conviction on the basis of accountability. See *People v. Redmond*, 341 Ill. App. 3d 498, 512, 793 N.E.2d 744, 756 (2003) ("[A]bsent some evidence of other circumstances or conduct from which it can be inferred that a person approved of the offense and aided it by his presence, mere presence is not enough to show that the person is an accomplice to a crime"); see also *People v. Washington*, 375 Ill. App. 3d 1012, 1030, 874 N.E.2d 331, 346 (2007), quoting *People v. Perez*, 189 Ill. 2d 254, 268, 725 N.E.2d 1258 (2000), quoting *People v. Shaw*, 186 Ill. 2d 301, 323, 713 N.E.2d 1161 (1998) ("'[O]ur supreme court has made clear that mere presence of a defendant at the scene of a crime, even when joined with *** knowledge of its commission, is insufficient to establish accountability. [Citations.] 'Accountability focuses on the degree of culpability of the offender and seeks to deter persons from *intentionally* aiding or encouraging the commission of offenses.' (Emphasis in original.) [Citation.] 'Thus, "[u]nless the accomplice *intends* to aid the commission of a crime, no guilt will attach."'" (Emphasis in original.) [Citation.]").

Accordingly, even in the face of other evidence of guilt, under the circumstances of this case, we are unable to declare beyond a reasonable doubt that such other evidence was sufficient to obviate and override the impact of defendant's videotaped confession, so as to render its erroneous admission harmless. See, *e.g.*, *St. Pierre*, 122 Ill. 2d at 114-15, 522 N.E.2d at 69 (holding that the circuit court's error in admitting defendant's confession into evidence contributed to the verdict and was therefore not harmless, even in light of evidence that would have been sufficient to sustain a guilty verdict, including testimony of a coconspirator and evidence of the presence of defendant's belt in the victim's apartment).

## IV. CONCLUSION

Because we conclude that the circuit court's erroneous admission of defendant's videotaped statement was not harmless error, we reverse defendant's conviction and remand for a new trial. Accordingly, we need not address defendant's further contentions on appeal with respect to the circuit court's barring the admission of Dr. Frumkin's testimony regarding her "interrogatory suggestibility" in giving the videotaped statement to police.

Reversed and remanded.

O'MALLEY, P.J., and McBRIDE, J., concur.