# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*In re Kenneth W.*, 2012 IL App (1st) 101787

| | |
|---|---|
| Appellate Court Caption | *In re* KENNETH W., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. KENNETH W., a Minor, Respondent). |
| District & No. | First District, Sixth Division <br> Docket No. 1-10-1787 |
| Filed | February 17, 2012 |
| Rehearing denied | March 5, 2012 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from an adjudication that respondent was delinquent based on the commission of criminal sexual assault, the appellate court held that the trial court's finding that respondent knowingly, intelligently and voluntarily waived his *Miranda* rights was not against the manifest weight of the evidence, that the portions of the testimony of the victim's father relaying out-of-court statements of the victim were properly admitted in evidence under section 115-10 of the Code of Criminal Procedure and did not violate the confrontation clause, and that any error in admitting a detective's testimony concerning the victim's out-of-court statements was harmless in view of the overwhelming evidence of respondent's guilt. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-JD-5874; the Hon. Terrence V. Sharkey, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal     Michael J. Pelletier, Alan D. Goldberg, and Gilbert C. Lenz, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Kalia M. Coleman, Assistant State's Attorneys, of counsel), for the People.

Panel     PRESIDING JUSTICE R. GORDON delivered the judgment of the court. Justices Garcia and Lampkin concurred in the judgment and opinion.

## OPINION

¶ 1     In a petition for adjudication of wardship filed December 3, 2007, respondent Kenneth W., a 15-year-old minor, was charged with aggravated criminal sexual abuse and criminal sexual abuse of C.M, his 4-year-old niece, between November 7, 2007, and November 15, 2007. A separate petition also brought the same charges against respondent's twin brother, Keith W. After a separate but simultaneous bench trial, the trial court adjudicated respondent a delinquent and sentenced him to an indeterminate term of custody until his twenty-first birthday in the Department of Juvenile Justice.

¶ 2     On this direct appeal, respondent claims, first, that the trial court's ruling was against the manifest weight of the evidence, where two psychologists disagreed over whether respondent was capable of making a knowing and intelligent waiver of his *Miranda* rights and the trial court found the testimony of one expert more persuasive than the other. Second, respondent claims that the trial court erred by admitting out-of-court statements by the victim, as relayed through the testimony of a detective and the victim's father.

¶ 3     First, we find that the trial court's *Miranda* ruling was not against the manifest weight of the evidence, where the trial court was presented with the conflicting testimony of two psychologists and where the trial court resolved the credibility conflict by finding the conclusions of one psychologist more persuasive than the other. Second, we find that the victim's statements to her father were nontestimonial, and thus the father's testimony about these out-of-court statements did not violate respondent's right to confront the witnesses against him. Third, we find that, even if the trial court erred by admitting a detective's testimony about other out-of-court statements made by the victim, there was no reasonable probability that the trier of fact would have acquitted respondent absent the error. The other evidence included: the respondent's confession and the testimony of the pediatrician who examined the victim on November 27, 2007, and who also relayed the victim's statements. Since the remaining evidence was overwhelming, we find no reasonable probability of acquittal, even absent the error.

¶ 4     For these reasons, we do not find respondent's claims persuasive and we affirm the

adjudication and sentence.

¶ 5 BACKGROUND

¶ 6 I. The Charges

¶ 7 On December 3, 2007, the State filed a petition of adjudication of wardship for respondent. The petition alleged that, between November 7, 2007, and November 15, 2007, respondent, who was the uncle of C.M., committed the offenses of aggravated criminal sexual abuse and criminal sexual abuse. Specifically, the petition alleged that respondent "rubbed lotion on his penis and victim's vagina and butt, " and "rubbed his penis on victim's vagina and butt."

¶ 8 On December 19, 2008, an amended petition was filed which alleged five counts: two counts of criminal sexual assault (counts I and II); two counts of aggravated criminal sexual abuse (counts III and IV); and one count of criminal sexual abuse (count V).

¶ 9 II. Respondent's Motion to Suppress His Statements

¶ 10 On April 16, 2009, respondent filed a motion to suppress his statements, alleging that his statements were obtained by the police during a custodial interrogation and without a knowing, voluntary, and intelligent waiver of his *Miranda* rights. Respondent alleged that, "due to the Minor-Respondent's age, physical, physiological, mental, educational and/or psychological state, capacity, and condition, he was incapable and unable to appreciate and understand fully the meaning of his *Miranda* rights."

¶ 11 At a suppression hearing which was held on July 10 and 24 and August 7, 2009, the following four witnesses were called by the State: Detectives Mark DiMeo and Jose Castaneda, who described the circumstances of respondent's custody and questioning; Assistant State's Attorney (ASA) Johanna Tracy, who interviewed respondent; and Dr. John Murray, a psychologist employed by the Du Page County Court Services and retained by the State who testified that respondent was capable of a knowing, intelligent and voluntary waiver of his *Miranda* rights. The defense called Dr. Ascher Levy, a staff psychologist at the Cook County Juvenile Court Clinic, who concluded that respondent could not have voluntarily waived his *Miranda* rights when he was questioned by the police on December 2, 2007.

¶ 12 Detective DiMeo testified that, on December 2, 2007, at approximately noon, he and his partner, Detective Jose Castaneda, drove to respondent's residence, where respondent and his father agreed to accompany the detectives to the police station. When they arrived at the police station, Detective DiMeo read respondent his *Miranda* rights in the presence of respondent's father. After reading aloud each right, the detective tried to explain what each right meant. For example, after informing him of the right to remain silent, the detective added "[y]ou could talk to me or not talk to me, the choice is yours." After informing respondent that he had a right to an attorney, Detective DiMeo added "[n]ot one from the police or one from the State's Attorney's Officer [*sic*], [an] attorney that works for you." The detective explained that an attorney is "someone that would work for [respondent] to see that

his rights and best interests were kept." To explain the concept that anything could be used against respondent in a court or proceeding, the detective told respondent that "if he talked to me that I would take notes and that later on people would hear what he told me, whether it was in a courtroom or in another type of proceeding." Starting at approximately 1:10 p.m., Detective DiMeo questioned respondent in the presence of respondent's father for approximately a half-hour and then placed respondent under arrest.

¶ 13    Detective Castaneda testified that, at approximately 4 p.m., he and Detective DiMeo transported respondent and respondent's father to another police station where respondent was given a polygraph examination. Respondent and his father were at this other police station for approximately two to three hours, and then the detectives transported them back to the original police station, arriving back at approximately 8 p.m. Detective Castaneda testified that he then contacted ASA Tracy who arrived at the police station at approximately 9:30 p.m.

¶ 14    ASA Tracy also testified that she arrived at the police station at approximately 9:30 p.m. Her interview of respondent began at approximately 10:15 p.m. and lasted approximately an hour and 45 minutes. Respondent's father was present for the entire interview. At some point, ASA Tracy asked the police officers to leave the room and asked respondent how he had been treated. Respondent indicated that he had not been mistreated, and he stated that he was not hungry. He also had a soda during the interview.

¶ 15    ASA Tracy testified that, before the interview began, she advised respondent and his father of respondent's *Miranda* rights. She also informed respondent that, if he wanted an adult there who was not his father, she could arrange for that. Respondent indicated that he wanted his father present. Since she was aware that respondent was a juvenile, after each right, she tried to explain it in more simple terms. For example, after the right to remain silent, she explained to him "that it meant he did not have to talk to [her] at all." Both respondent and his father indicated that they understood the *Miranda* rights.

¶ 16    The hearing was continued until July 24, 2009, when the defense called Dr. Ascher Levy, a staff psychologist in the Cook County Juvenile Court Clinic. Dr. Levy testified that he had been asked by the trial court to evaluate whether there were factors that may have affected respondent's ability to understand and waive his *Miranda* rights at the time of the interviews by the police and the ASA. Dr. Levy testified that he had concluded, within a reasonable degree of professional certainty, that respondent could not have knowingly, intelligently and voluntarily waived his *Miranda* rights at the time of the police interviews.

¶ 17    The parties offered a stipulation that Dr. Levy, who had a doctorate in clinical psychology, was an expert in clinical psychology and he was accepted as an expert by the court.

¶ 18    Dr. Levy testified that, as part of his evaluation, he interviewed respondent twice, once on May 1, 2008, and once on June 3, 2008, for a total time of approximately an hour and 45 minutes. In addition to these interviews, Dr. Levy also reviewed police records, hospitalization and outpatient treatment records and school records. In addition to interviewing respondent and receiving his records, Dr. Levy also interviewed respondent's father and mother, and his twin brother.

¶ 19    Dr. Levy testified that, based on his interviews and respondent's records, respondent had experienced psychotic symptoms for as long as seven years prior to the police interview. Respondent was prescribed antipsychotic medication but respondent informed Dr. Levy that he had not been taking his medication at the time of the police interview. Dr. Levy testified that respondent had also previously been diagnosed with depression and attention deficit hyperactivity disorder (ADHD).

¶ 20    Dr. Levy explained that psychosis could interfere with a person's ability to intelligently, knowingly and voluntarily waive his *Miranda* rights because the person is out of touch with reality and may be experiencing hallucinations or delusions that interfere with logical reasoning. Depression could also affect this ability because it may impair attention and concentration, and it may render a person unconcerned about what is going to happen to him or her. ADHD affects a person's ability to take in and process information, such as *Miranda* rights.

¶ 21    Dr. Levy testified that, during his interview of respondent, he observed symptoms of ADHD, namely, that respondent's short-term memory was impaired. Respondent had difficulty repeating back information which Dr. Levy had just provided.

¶ 22    Dr. Levy testified that, based on the information that he gathered, respondent had a lower than average intelligence. For example, Dr. Levy testified that, during his interview of respondent, the doctor frequently found that he would ask questions and respondent would not grasp their meaning.

¶ 23    When asked whether he thought respondent was intentionally trying to fail in answering questions about the *Miranda* warnings, Dr. Levy responded: "I believe that some of his statements may have been self-serving, that he may have deliberately been trying to present that."

¶ 24    Dr. Levy testified that circumstances that affected respondent's ability to knowingly and voluntarily waive his *Miranda* rights included the fact that: respondent had not eaten all day; he had been at the police station 13 hours; and the ASA's interview had lasted until well past the typical bedtime of someone his age. Also respondent and his father had both informed Dr. Levy that they had requested a lawyer, that they were not provided with one, and that respondent had been threatened with adult prosecution.

¶ 25    During cross-examination, Dr. Levy testified that respondent had been hospitalized three times: in June 2006, in July 2006, and in January 2007. Dr. Levy testified that respondent had told him that his mother initiated all three hospitalizations because of inappropriate displays of anger and that he had never experienced any of the symptoms described in the hospital reports. Respondent's father also stated that he had never observed respondent act strangely. Dr. Levy's impression was that respondent had received a bipolar diagnosis based on misinformation provided by the mother. Dr. Levy agreed that the only family member who agreed with the symptoms listed in the hospital records was respondent's mother.

¶ 26    During cross-examination, Dr. Levy also acknowledged that respondent had not taken his medication prior to Dr. Levy's interviews of respondent, and Dr. Levy was still able to arrive at a conclusion. Also respondent was never in special education, and respondent reported that he was never developmentally delayed in any areas.

¶ 27    Dr. Levy testified that respondent stated that he watched a television show called "Cops" and that he was able to follow the plots of the show. Dr. Levy testified that, in his report, he stated that "respondent was familiar with the Miranda warnings from television shows that he watched prior to his interview with the police, such as [']Cops['']," that "he was able to recite the *Miranda* warnings from memory," and that "although he misstated a few words, that did not change their meaning."

¶ 28    During Dr. Levy's interview, respondent told Dr. Levy that the right to remain silent meant "[d]on't say another word." When asked the meaning of the second *Miranda* warning (*i.e.*, anything you say can be used against you), respondent stated that it meant "[i]f I say anything bad to the policemen, it might be used against me" and "the judge will give me extra time for resisting arrest." With respect to respondent's understanding of the right to an attorney, respondent stated that an attorney is "someone to back you up, sidekick."

¶ 29    On cross-examination, Dr. Levy testified that he was familiar with Dr. John Murray and that he recognized Dr. Murray as an expert in their field.

¶ 30    In rebuttal, the State called Dr. John Murray, a clinical psychologist employed by the Du Page County Court Services, who testified that, based on his evaluation of respondent, respondent was capable of intelligently, knowingly and voluntarily waiving his *Miranda* rights on December 2, 2007, when he was interviewed by the police and the ASA. Dr. Murray testified that his opinion was made to a reasonable degree of professional psychological certainty. The basis of Dr. Murray's opinion was a 90-minute interview with respondent held on March 11, 2009, as well as respondent's mental health and school records. The parties stipulated that Dr. Murray was an expert in clinical psychology, and the trial court accepted him as an expert.

¶ 31    Dr. Murray testified that respondent's hospitalizations were "facilitated" by his mother, and the primary reason for them was respondent's anger. Dr. Murray observed that respondent had received several different diagnoses at several different times. Respondent insisted to Dr. Murray that there was nothing wrong with him and that he never experienced any of the symptoms reported by professionals or family members. Respondent told Dr. Murray that he had not taken any medication for approximately a year before the police interviews. Dr. Murray concluded, based on his evaluation of respondent, that respondent did not present symptoms of any psychiatric disorder.

¶ 32    According to tests that Dr. Murray performed, respondent had low average to borderline intellectual functioning. From respondent's school records, Dr. Murray learned that responded had a C average during the first semester of his freshman high school year. The first semester, which concluded in December 2007, included the time of the police interviews. During the second interview, he had almost a B average. Respondent told Dr. Murray that he was working to bring up his grades and that he had some success.

¶ 33    Dr. Murray testified that, during their interview, respondent explained that the right to remain silent meant the right "to be quiet." When asked to explain the second *Miranda* warning, respondent said that he did not know what it meant. However, when asked the meaning of the right to have an attorney, respondent replied "I don't understand, tell Judge Sharkey that." Respondent denied that the police had read him his *Miranda* rights and denied

-6-

knowing them from watching television shows. However, Dr. Murray testified that, since Dr. Levy's report documented that respondent was aware of the *Miranda* rights and knew them from television shows, Dr. Murray concluded that respondent's denial to him was "an obvious contradiction." Dr. Murray stated that, during the interview, respondent was "guarded" and "defensive."

¶ 34    Dr. Murray stated that respondent claimed that the police officers struck him twice in the head and he went "out." Respondent stated that he did not know if he was hit by a flashlight or a stick. From Dr. Murray's review of the records, respondent had not made this claim before, and Dr. Murray did not believe it.

¶ 35    On August 20, 2009, the trial court denied respondent's motion to suppress his statements and found that respondent's waiver of his *Miranda* rights was knowing, voluntary and intelligent. The trial court stated that "it comes down to whether I believe Dr. Murray or whether I believe Dr. Levy. I choose to believe Dr. Murray." Explaining the basis for his conclusion, the trial court stated:

"The minor is not on any medication by choice. He is not being treated for any psychosis or psychiatric problems on the date of the interview. He's not showing any signs when the–when he talks to Dr. Murray of the incident that day, the interview that day.

He was at home well, getting ready to watch a football game and eating with his father [on December 2, 2007]. There were no symptoms whatsoever. The minor denied ever having these symptoms. The dad in the interview had never seen any of these symptoms. It was simply brought to their attention by the mother ***."

¶ 36    The trial judge stated that he also considered the minor's age and intelligence, the fact that he received the standard *Miranda* rights and additional explanations, and the presence of a parent. As a result, the trial court found that the State had met its burden to prove by a preponderance that respondent's *Miranda* waiver was knowing, intelligent and voluntary.

¶ 37                    III. State's Motion to Admit Victim's Out-of-Court Statements

¶ 38    On April 17, 2009, the State filed a motion asking the trial court to admit the victim's out-of-court statements (1) made to her father on November 16, 2007, and (2) made during her "victim-sensitive interview" (VSI) on November 27, 2007, and observed by the detective. After a hearing, the trial court held that the statements by the victim to her father were nontestimonial, while the statements observed by the detective were testimonial. The trial court then held that, if the victim was not able to testify, then the statements observed by the detective would be barred, but the statements to the victim's father would still be admissible. However, if the victim was able to testify and be subjected to cross-examination, then both statements would be admissible.

¶ 39                    IV. The Bench Trial

¶ 40    On March 29, 2011, the trial court held a severed but simultaneous bench trial. The State's first witness was then seven-year-old C.M., who identified respondent and his brother

-7-

as her uncles. She stated that she calls her vaginal area her "private part" or her "poo-poo." When asked whether anyone had ever touched her "poo-poo" or her butt, she answered no. She could not recall telling her father something about her uncles after her return from her grandmother's house when she was four years old. She recalled "the place with the big chairs," which both parties presume in their briefs to the court was the place where the VSI was conducted. But she could not recall talking to a woman about her uncles.

¶ 41    After C.M.'s testimony, respondent moved for a finding that her statements were inadmissible, on the ground that C.M. was unavailable to testify. The trial court ruled that she was available and denied the motion. Respondent chose not to cross-examine C.M.

¶ 42    The State's next witness was the victim's father. The victim's father testified as to the statement that C.M. had made to him on the evening of November 16, 2007. He testified that, in November 2007, C.M. lived with her paternal grandmother. Sometime around November 9, 2007, the paternal grandmother went out of town for approximately a week and C.M. stayed with her maternal grandmother. At that time, C.M.'s mother and her uncles (respondent and his twin brother) also lived with the maternal grandmother.

¶ 43    The victim's father testified that, on November 16, 2007, the paternal grandmother picked C.M. up from day care and drove her to the house of the father's then-girlfriend. At approximately 9 p.m., C.M.'s father observed C.M. lying on top of his girlfriend's three-year old son and moving her pelvis in an up and down motion. When the father asked them what they were doing, at first they said "nothing." But then C.M. said that they were "humping." The father asked where C.M. had learned to "hump," and she said from her uncles. When the father placed a pillow on the floor and asked her to demonstrate "humping," C.M. straddled the pillow and moved her pelvis back and forth. C.M. further told the father that they were "humping" with their "stuff" on her "poo-poo" and her "butt." The father testified that he understood "poo-poo" and "butt" to refer to her vagina and her behind, and his impression of the humping "was sexual activity, the way she was moving." When he asked her about the word "stuff," she pointed to her vaginal area and said that it had hair around it which the father understood to mean penis. C.M. stated that her uncles placed Vaseline and lotion on her "poo-poo" and "butt" and then "humped" her. C.M. stated that the "humping" occurred at "nana's house," and that "nana" is the word C.M. uses for her maternal grandmother.

¶ 44    The father further testified that C.M. described the humping as "they [respondent and his twin brother] be putting lotion on her butt and her poo-poo and they hump on her" without her clothes and "they be touching on me." The father did not know if it happened more than once. The father was asked this question and gave this answer:

"QUESTION: At the time, that you were talking to [C.M.] on Thursday at any time did the thought of [respondent and his brother] being prosecuted in a criminal case ever cross your mind?

ANSWER: No."

¶ 45    At the time of the father's conversation with his daughter, his girlfriend was also present for part of the conversation and also participated in asking C.M. questions. Although the girlfriend did not testify at trial, it appears from the father's testimony that she was a calming influence during the questioning process.

¶ 46    ASA Tracy testified consistent with her testimony from the suppression hearing, which was already described above. Tracy also testified that, after informing respondent of his *Miranda* rights, she asked respondent what had led to his arrest. Tracy testified that respondent stated that "one day he got [C.M.] out of the tub–the bathtub and rubbed lotion on her–dried her off and rubbed lotion on her vagina and her butt and also rubbed lotion on his own penis," that "he rubbed it on her vagina for 2 to 3 minutes," and that "he put her underwear on and rubbed his penis–turned her around and rubbed his penis on her butt but over her underwear." Tracy testified that respondent then left the room to ejaculate, but C.M. walked into the room and saw him doing that. Respondent stated that his brother was not there.

¶ 47    ASA Tracy testified that respondent told her that, a couple of days later, respondent and his brother went with C.M. into the brother's room to watch a movie. Respondent stated that he observed his brother "humping" C.M. in bed and then respondent lay in bed with C.M. and rubbed his penis "in her butt."

¶ 48    The State's next witness was Detective DiMeo, who testified that he observed C.M.'s VSI at the Children's Advocacy Center (CAC) on November 27, 2007. Only C.M. and the interviewer were present in the interview room. However, Detective DiMeo, an ASA and a representative from the Department of Children and Family Services sat in an adjacent room with a one-way mirror and an audio system to watch and listen to the interview.

¶ 49    At this point in the testimony, respondent renewed his objection to the detective testifying to C.M.'s statement, which was denied.

¶ 50    Detective DiMeo then testified that C.M. made the following statements. C.M. told the interviewer that respondent and his brother had rubbed lotion on her vagina, which she called her "poo-poo," and they "humped" her, which she demonstrated by "a rocking of her pelvis in a back and forth motion" while standing up. C.M. stated that the lotion was pink and white and that it burned her vagina. C.M. stated that they "humped" her with their "stuff." When she said their "stuff," she pointed to her pelvic region. The detective testified that "she said that they humped her booty and her poo-poo and that their stuff went into her hole." C.M. stated that respondent's brother placed his "stuff" inside her mouth and made her "suck his stuff." C.M. stated that respondent stroked his penis and "spit" came out of his "hole," and the spit was grey and yellow in color, and it went on to her "booty" and "poo-poo." C.M stated that the "stuff" of both respondent and his brother went into "her hole" and "booty" and mouth. C.M. stated that, when they were watching a movie at her "nana's" house, respondent and his brother took her clothes off.

¶ 51    Dr. Marjorie Fujara, a pediatrician at Stroger Hospital and the CAS, testified that, on November 27, 2007, C.M. was referred to her with instructions to conduct a medical examination based on allegations of sexual abuse. After a comprehensive physical examination, Dr. Fujara found nothing physically unusual. In particular, her hymen had no tears or scars, and her labia minora and her urethral orifice appeared normal, and there were no signs of physical trauma to her vaginal or anal area. Dr. Fujara testified that a lack of tears or scars to the hymen does *not* rule out deep penetration. However, the doctor agreed that a tear or a scar would support an allegation of sexual abuse. Dr. Fujara testified that none of

her physical observations ruled out the possibility of sexual penetration, "because the vast majority of children have normal exams even if they're sexually abused."

¶ 52 Dr. Fujara testified that, during the examination, C.M. told Dr. Fujara that "they put their nut on her poo-poo and her butt." When C.M. said "butt," she pointed to her buttocks. Dr. Fujara testified that it was clear that when C.M. said "poo-poo" she mean her crotch. Dr. Fujara asked C.M. if they put their nuts inside or outside or if she was not sure. C.M. said "inside." Dr. Fujara asked C.M. to demonstrate what C.M. meant by the word "inside" by using a sterile urine cup and a piece of gauze. Dr. Fujara testified that C.M. "accurately" demonstrated what the word meant by unscrewing the top of the cup and placing the gauze inside the cup. At trial, respondent initially objected to the pediatrician's testimony of C.M.'s statement to her. However, respondent withdrew this objection and asked that the trial court "limit her testimony to the specific hearsay exception[, for statements made for the purpose of medical diagnosis,] specifically, to include things such as the identification of perpetrators, things of that nature." The trial court agreed.

¶ 53 After Dr. Fujara's testimony, the State rested and the trial court denied respondent's motion for a directed verdict. Respondent called C.M.'s maternal grandmother, who testified that she lived with her three children: respondent; respondent's brother; and the victim's mother. She further testified that C.M.'s mother and father broke up soon after C.M. was born and that she and C.M.'s mother retained custody of C.M. until the end of 2003 when the paternal grandmother received guardianship. In June 2007, C.M.'s mother retained a lawyer to try to regain custody, and a petition was filed.

¶ 54 Respondent next called C.M.'s mother, who is also respondent's sister. C.M.'s mother testified that she and C.M.'s father broke up shortly after C.M. was born. At first, C.M.'s mother and C.M. lived with the maternal grandmother, but then in 2003 and 2004, C.M.'s mother and C.M. lived with the paternal grandmother. C.M.'s mother testified that the paternal grandmother then lied to the court and said that she did not know C.M.'s mother's whereabouts, and the paternal grandmother received temporary guardianship. In June 2007, when C.M.'s mother filed a petition in court to regain guardianship, she was living in her mother's house with her two brothers. In November 2007, the paternal grandmother informed the "guardianship court" that C.M.'s mother was living with her brothers and that they were accused of a sexual assault against C.M.

¶ 55 After closing arguments, the trial court determined that respondent was guilty of criminal sexual assault. Specifically, the trial court found respondent guilty of all five counts, but the court merged count II into count I, and merged counts IV and V into count III. Count I was for criminal sexual assault, and count III was for aggravated criminal sexual abuse. On May 4, 2010, the trial court sentenced respondent to an indeterminate term of custody and ordered respondent to register as a sex offender for life. On May 14, 2010, respondent filed a notice of appeal, and this appeal followed.

¶ 56                                                    ANALYSIS

¶ 57 On this direct appeal, respondent claims, first, that the trial court's ruling was against the manifest weight of the evidence, when it found that respondent made a knowing, intelligent

and voluntary waiver of his *Miranda* rights. Second, respondent claims that the trial court erred by admitting the portion of the detective's and father's testimony that relayed out-of-court statements by the victim. For the reasons discussed below, we find: (1) that the trial court's *Miranda* ruling was not against the manifest weight of the evidence, (2) that the victim's statements to her father were nontestimonial and thus the father's testimony about the out-of-court statements did not violate respondent's right to confront the witnesses against him; and (3) that any error in admitting the detective's testimony about other out-of-court statements made by the victim was harmless because the remaining evidence was overwhelming.

¶ 58                                    I. Valid *Miranda* Waiver

¶ 59        Respondent's first claim is that the trial court's ruling was against the manifest weight of the evidence when it found that respondent was capable of making a knowing, intelligent and voluntary *Miranda* waiver.

¶ 60        The State has the burden of proving, by a preponderance of the evidence, that respondent's *Miranda* waiver was voluntary, intelligent and knowing. *People v. Daniels*, 391 Ill. App. 3d 750, 780 (2009). When evaluating a *Miranda* waiver, a trial court must consider the totality of the circumstances. *Daniels*, 391 Ill. App. 3d at 781. On review, we apply a bifurcated standard of review. *Daniels*, 391 Ill. App. 3d at 780. We review *de novo* the ultimate question of whether the confession was voluntary. *Daniels*, 391 Ill. App. 3d at 780. However, "the subissue of whether a *Miranda* waiver was knowing and intelligent is factual." *Daniels*, 391 Ill. App. 3d at 780. Thus, a reviewing court will not reverse a trial court's knowing-and-intelligent finding unless it is against the manifest weight of the evidence. *Daniels*, 391 Ill. App. 3d at 780. A factual finding is against the manifest weight of the evidence only if the opposite conclusion is readily apparent or when the finding appears to be unreasonable, arbitrary or not based on the evidence. *Vancura v. Katris*, 238 Ill. 2d 352, 385-86 (2010). "This deferential standard is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. McDonough*, 239 Ill. 2d 260, 266 (2010).

¶ 61        We find, for the reasons explained below, that the trial court's finding was not against the manifest weight of the evidence. "The crucial test to be used in determining whether an accused knowingly and intelligently waived [his or] her rights is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of [his or] her rights." *Daniels*, 391 Ill. App. 3d at 781.

¶ 62        Explaining the basis for its conclusion, the trial court observed that, on the day of the interview, the minor was not on any medication, he was not being treated for any psychosis or psychiatric condition, and he was not exhibiting any psychiatric symptoms. In addition, the trial court observed that respondent denied ever having had any of these symptoms. The trial judge stated that he also considered the minor's age and intelligence, the presence of a parent, and the fact that respondent received both the standard *Miranda* rights and more

simplified explanations. In addition, we observe that the minor maintained a C average in school, which he improved to a B average in the semester following the police interview, and that he was never placed in special education. As a result, we cannot find that the trial court's *Miranda* ruling was unreasonable, arbitrary or not based on the evidence or that an opposite conclusion is readily apparent. Thus, we must affirm.

¶ 63                                II. Out-of-Court Statements by Victim

¶ 64        Second, respondent claims that the trial court erred by admitting the portions of the detective's and the father's testimony that relayed out-of-court statements by the victim and that this testimony was not harmless. Respondent argues that C.M.'s out-of-court statements were not admissible under section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2008)) and violated the confrontation clause of the federal and Illinois constitutions. We examine the detective's and the father's testimony separately.

¶ 65                                     A. *Father's Testimony*

¶ 66        First, we consider whether the father's testimony was properly admitted. When a court evaluates the admission of out-of-court statements into evidence, the first step is to determine whether "the statement passes muster as an evidentiary matter." *In re E.H.*, 224 Ill. 2d 172, 179 (2006). The court considers constitutional objections only after the statement has been found admissible as an evidentiary matter. *In re E.H.*, 224 Ill. 2d at 179-80.

¶ 67        In the case at bar, section 115-10 provides a basis for admitting the father's testimony concerning C.M.'s out-of-court statements. Section 115-10 provides:

> "(a) In a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13, *** the following evidence shall be admitted as an exception to the hearsay rule:
>
> ***
>
> (2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim.
>
> (b) Such testimony shall only be admitted if:
>
> (1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and
>
> (2) The child *** either:
>
> (A) testifies at the proceeding; or
>
> (B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement[.]" 725 ILCS 5/115-10 (West 2008).

¶ 68        We will reverse the trial court's determination that evidence is admissible under section 115-10 only if the record demonstrates that the trial court abused its discretion. *People v.*

*Sharp*, 391 Ill. App. 3d 947, 955 (2009) (citing *People v. Bowen*, 183 Ill. 2d 103, 120 (1998)). " 'An abuse of discretion occurs when the [court's] ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view.' " *Sharp*, 391 Ill. App. 3d at 955 (quoting *People v. Robertson*, 312 Ill. App. 3d 467, 469 (2000)).

¶ 69 In the case at bar, the parties focus on the issue of whether section 115-10(b)(2) is satisfied, namely, whether C.M. testified or her statements were corroborated. They do not claim that her statements to her father were unreliable. Indeed, the reliability of the statement is strong, because C.M. had little time to invent a story to tell her father, and the "humping" that she described would not ordinarily be in the vocabulary of a four- or five-year-old child.

¶ 70 We agree with the State that the father's testimony concerning C.M.'s out-of-court statements was admissible under section 115-10 because there was corroborative evidence of the act. In fact, respondent stated, unequivocally, that he rubbed his penis "in her butt," as well as describing additional sexual acts. Additionally, the pediatrician who examined the victim testified to the victim's statements that "they" put "their nut" "inside" her "butt" and "poo-poo." We find this evidence sufficiently corroborative to satisfy section 115-10, and accordingly, we do not find that the trial court erred in finding the father's statement admissible under the statute.

¶ 71 Next, we proceed to the question of whether admission of the father's testimony violated respondent's constitutional rights under the confrontation clause. The sixth amendment to the United States Constitution provides that: "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." U.S. Const., amend. VI. This part of the sixth amendment is known as the confrontation clause and applies to the states through the fourteenth amendment. *People v. Stechly*, 225 Ill. 2d 246, 264 (2007). In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held: "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually proscribes: confrontation." *Crawford*, 541 U.S. at 68-69.

¶ 72 We find the father's testimony nontestimonial. This four-year-old did not know that humping or whatever she was doing was wrong. She freely explained and demonstrated it and was doing it with a three-year-old, just like playing a game. A reasonable four-year-old in the declarant's shoes would never conclude that her statement could be used against respondent, because she cannot fathom that respondent did anything wrong at this point in time. In addition, the father's questioning of his daughter was not for the purpose of gathering evidence against her attacker but out of concern for her welfare.

¶ 73                              B. *Detective's Testimony*

¶ 74 We next consider whether the trial court erred in admitting the detective's testimony. In its brief to this court, the State conceded that the out-of-court statements relayed by the detective were testimonial. However, we still affirm because we find, for the reasons discussed below, that the admission of the detective's testimony was harmless error.

¶ 75 Both violations of section 115-10 and confrontation clause violations are subject to a harmless-error analysis. See *In re E.H.*, 224 Ill. 2d 172, 180-81 (2006); *People v. Spicer*, 379

-13-

Ill. App. 3d 441, 456 (2007). An error is harmless if it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained. *Spicer*, 379 Ill. App. 3d at 458. We will find that an evidentiary error did not contribute to the verdict only when there is no reasonable probability that the fact finder would have acquitted the defendant absent the error. *In re E.H.*, 377 Ill. App. 3d 406, 415 (2007).

¶ 76    In its brief to this court, respondent concedes that respondent's statement was the most crucial evidence at trial, and we agree. Respondent stated, unequivocally, that he rubbed his penis "in her butt," as well as describing additional sexual acts. For the reasons discussed in the section above, we found that this statement was admissible.

¶ 77    The respondent's statement, by itself, was, without a doubt, sufficient for a fact finder to find respondent guilty. *Spicer*, 379 Ill. App. 3d at 458 n.12 (citing *People v. McIntosh*, 305 Ill. App. 3d 462, 467-68 (1999)). However, the question on this appeal is not whether respondent's statement was sufficient evidence, but whether it was overwhelming. We find that it was. Respondent's statement was "never recanted and never refuted." *Spicer*, 379 Ill. App. 3d at 458. Prior to trial, respondent moved to suppress setting forth a *Miranda* argument only, which both the trial court and this court rejected. As in *Spicer*, "we cannot find any evidence in the record which contradicts [respondent's] statement." *Spicer*, 379 Ill. App. 3d at 458. His statement, coupled with the testimony of the pediatrician who examined the victim and testified to the victim's statements of sexual assault, constituted overwhelming evidence. In her statement to the pediatrician, C.M. corroborated respondent's statement by stating that "they" had put "their nut" "inside" her "butt." She also stated that they had put "their nut" inside her "poo-poo." Thus we find that, absent the error, there was no reasonable probability of an acquittal.

¶ 78                                          CONCLUSION

¶ 79    On this direct appeal, respondent claims, first, that the trial court's ruling was against the manifest weight of the evidence, when it found that respondent made a knowing, intelligent and voluntary waiver of his *Miranda* rights. Second, respondent claims that the trial court erred by admitting the portion of the detective's and father's testimony that relayed out-of-court statements by the victim.

¶ 80    For the reasons discussed above, we find: (1) that the trial court's *Miranda* ruling was not against the manifest weight of the evidence; (2) that the victim's statements to her father were nontestimonial and thus the father's testimony about these out-of-court statements did not violate respondent's right to confront the witnesses against him; and (3) that any error in admitting the detective's testimony about other out-of-court statements made by the victim was harmless, because the remaining evidence was overwhelming.

¶ 81    Affirmed.